Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 22-10964-mg

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   CELSIUS NETWORK, LLC,

8           Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Adv. Case No. 22-01139-mg

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   CELSIUS NETWORK LIMITED, et al.,

13           Plaintiffs.

14       Vs.

15   STONE, et al,

16           Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18   Adv. Case No. 22-01140-mg

19   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20   CELSIUS NETWORK LIMITED, et al.,

21           Plaintiffs.

22       Vs.

23   PRIME TRUST, LLC,

24           Defendant.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Page 2

1                    United States Bankruptcy Court

2                    One Bowling Green

3                    New York, NY   10004

4

5                    October 20, 2022

6                    10:01 A.M.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   KS

Page 3

1   HEARING re Hearing Using Zoom for Government RE: Motion of

2   Community First Partners, LLC, Celsius SPV Investors, LP,

3   Celsius New SPV Investors, LP, and CDP Investissements Inc.

4   for Entry of an Order Directing the Appointment of an

5   Official Preferred Equity Committee. (Doc# 880, 886, 897,

6   898, 924, 948, 1045, 1048, 1049, 1120, 1122)

7

8   HEARING re Debtor's Motion Seeking Entry of an Order (I)

9   Approving the Bidding Procedures in Connection with the Sale

10  of Substantially All of the Debtors Assets, (II) Scheduling

11  Certain Dates with Respect Thereto, (III) Approving the Form

12  and Manner of Notice Thereof, (IV) Approving Contract

13  Assumption and Assignment Procedures, and (V) Granting

14  Related Relief. (Doc# 929, 1040, 1046, 1047, 1051, 1054,

15  1056, 1059, 1063, 1065, 1077, 1080, 1109, 1110, 1113)

16

17  Hearing Using Zoom for Government RE: Motion to (A) Continue

18  to Operate Their Cash Management System, (B) Honor Certain

19  Prepetition Obligations Related Thereto, (C) Maintain

20  Existing Business Forms, and (D) Continue to Perform

21  Intercompany Transactions, (II) Granting Superpriority

22  Administrative Expense Status to Postpetition Intercompany

23  Balances, and (III) Granting Related Relief (Doc## 21, 56,

24  401, 448, 479, 513, 592, 626, 643, 699, 720. 927, 1108,

25  1113)

Page 4

1   HEARING re Hearing Using Zoom for Government RE: Debtor's

2   Motion for Entry of an Order (I) Extending the Time to File

3   Notices of Removal of Civil Actions and (II) Granting

4   Related Relief. (Doc# 987)

5

6   HEARING re Hearing Using Zoom for Government RE: Examiner's

7   Motion for an Order Authorizing the Examiner to Conduct

8   2004 Examinations (Doc. ## 959, 963, 1000, 1078, 1087, 1104,

9   1105).Going forward Only if Order to Shorten

10  Time (Doc no. 1000) is granted.

11

12  HEARING re Adversary proceeding: 22-01139-mg Celsius Network

13  Limited et al v. Stone et al Pre-trial Conference Using Zoom

14  for Government. (Doc ## 1, 2, 4, 8, 9, 13)

15

16  HEARING re Adversary proceeding: 22-01140-mg Celsius Network

17  Limited et al v. Prime Trust, LLC Pre-trial Conference Using

18  Zoom for Government. (Doc ## 1 to 3, 7, 8, 11)

19

20  HEARING re Adversary proceeding: 22-01140-mg Celsius Network

21  Limited et al v. Prime Trust, LLC Doc# 1146 Amended Notice

22  of Agenda for the Hearing to be held October 20, 2022, at

23  10:00 a.m. (prevailing Eastern Time)

24

25

Page 5

1    HEARING re Adversary proceeding: 22-01140-mg Celsius Network

2    Limited et al v. Prime Trust, LLC Requesting Holders Motion

3    for Entry of an Order Authorizing the Filing of Certain

4    Information Under Seal in Connection with the Reply in

5    Further Support of The Requesting Holders Motion for entry

6    of an Order Directing the Appointment of an Official

7    Preferred Equity Committee. (Doc# 1118, 1123)

8

9    HEARING re Adversary proceeding: 22-01140-mg Celsius Network

10   Limited et al v. Prime Trust, LLC Requesting Holders Motion

11   to Shorten Notice on Their Motion for Entry of an Order

12   Authorizing the Filing of Certain Information Under Seal in

13   Connection with the Reply in Further Support of The

14   Requesting Holders Motion for Entry of an Order Directing

15   the Appointment of an Official Preferred Equity Committee

16   (Doc## 1118, 1119, 1124)

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    AKIN GUMP STRAUSS HAUER FELD, LLP

4         Special Litigation Counsel for Celsius Network, LLC

5         One Bryant Park

6         New York, NY 10036

7

8    BY:  DEAN CHAPMAN (TELEPHONICALLY)

9         MITCHELL HURLEY (TELEPHONICALLY)

10

11   AKIN GUMP STRAUSS HAUER FELD, LLP

12        Special Litigation Counsel for Celsius Network, LLC

13        2300 N Field Street, Suite 1800

14        Dallas, TX 75201

15

16   BY:  ELIZABETH SCOTT (TELEPHONICALLY)

17

18   ROCHE FREEDMAN, LLP

19        Attorneys for KeyFi

20        99 Park Avenue, Suite 1910

21        New York, NY 10016

22

23   BY:  KYLE WILLIAM ROCHE (TELEPHONICALLY)

24

25

Page 7

```
 1   MCCARTER ENGLISH, LLP

 2        Attorneys for Ad Hoc Committee of Borrowers

 3        245 Park Avenue

 4        New York, NY 10167

 5

 6   BY:  DAVID J. ADLER (TELEPHONICALLY)

 7

 8   MILBANK

 9        Attorneys for Series B Preferred Equity Shareholders

10        55 Hudson Yards

11        New York, NY 10001

12

13   BY:  DENNIS DUNNE (TELEPHONICALLY)

14        ANDREW LEBLANC (TELEPHONICALLY)

15

16   DOW JONES

17        Attorneys for Dow Jones

18        1211 Avenue of the Americas

19        New York, NY 10036

20

21   BY:  SOMA BISWAS (TELEPHONICALLY)

22

23

24

25
```

Page 8

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        Southern District of New York

4        201 Varick Street

5        New York, NY 10014

6

7   BY:  MARK BRUH (TELEPHONICALLY)

8        SHARA CLAIRE CORNELL (TELEPHONICALLY)

9        BRIAN S. MASUMOTO (TELEPHONICALLY)

10       LINDA RIFFKIN (TELEPHONICALLY)

11

12   WHITE CASE, LLP

13        Attorneys for Official Committee of Unsecured Creditors

14        555 South Flower Street, Suite 2700

15        Los Angeles, CA 90071

16

17   BY:  AARON COLODNY (TELEPHONICALLY)

18        SAMUEL P. HERSHEY (TELEPHONICALLY)

19        GREGORY F. PESCE (TELEPHONICALLY)

20        DAVID TURETSKY (TELEPHONICALLY)

21        KEITH WOFFORD (TELEPHONICALLY)

22

23

24

25

1   DANIEL A. FRISHBERG

2        Pro se

3        284 Monroe Dr

4        Mountain View, CA 94040

5

6   BY:  DANIEL A. FRISHBERG (TELEPHONICALLY)

7

8   IMMANUEL HERRMANN

9        Pro se

10        8201 Schrider Street, Apt. 6

11        Silver Spring, MD 20910

12

13   BY:  IMMANUEL HERMMANN (TELEPHONICALLY)

14

15   KIRKLAND ELLIS

16        Attorneys for Celsius

17        300 N LaSalle

18        Chicago, IL 60654

19

20   BY:  CHRIS KOENIG (TELEPHONICALLY)

21

22

23

24

25

Page 10

1    TOGUT SEGAL SEGAL, LLP

2         Attorneys for Ad Hoc Group of Custodial Account Holders

3         One Penn Plaza, Suite 3335

4         New York, NY 10119

5

6    BY:  BRYAN KOTLIAR (TELEPHONICALLY)

7         KYLE J. ORTIZ (TELEPHONICALLY)

8

9    TROUTMAN PEPPER HAMILTON SANDERS, LLP

10        Attorneys for Ad Hoc Group of Withhold Account Holders

11        4000 Town Center, Suite 1800

12        Southfield, MI 48075

13

14   BY:  DEBORAH KOVSKY-APAP (TELEPHONICALLY)

15

16   JENNER BLOCK

17        Attorneys for the Examiner

18        353 N. Clark Street

19        Chicago, IL 60654

20

21   BY:  VINCENT LAZAR (TELEPHONICALLY)

22        SHOBA PILLAY (TELEPHONICALLY)

23

24

25

1   JONES DAY

2        Attorneys for CDP Instissements, Inc.

3        555 S Flower Street, 50th FL

4        Los Angeles, CA 90071

5

6   BY:  JOSHUA MESTER (TELEPHONICALLY)

7

8   TEXAS OFFICE OF ATTORNEY GENERAL

9        Attorneys for TX State Securities Board, Department of

10       Banking

11       P.O. Box 12548

12       Austin, TX 78711-2548

13

14  BY:  LAYLA MILLIGAN (TELEPHONICALLY)

15

16  DELAWARE ADR, LLC

17       Attorneys for Proposed Fee Examiner

18       P.O. Box 7908

19       Wilmington, DE 19803

20

21  BY:  CHRISTOPHER S. SONTCHI (TELEPHONICALLY)

22

23

24

25

1    GODFREY KAHN, S.C.

2           Proposed Counsel for Fee Examiner

3           One East Main Street, Suite 500

4           P.O. Box 2719

5           Madison, WI 53701-2719

6

7    BY:   KATHERINE STADLER (TELEPHONICALLY)

8

9    GOODWIN PROCTER, LLP

10          Attorneys for Prime Trust

11          The New York Times Building

12          620 Eighth Avenue

13          New York, NY 10018

14

15   BY:   HOWARD STEEL (TELEPHONICALLY)

16

17   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

18          Attorneys for Interested Party

19          One Manhattan West

20          New York, NY 1001

21

22   BY:   JONATHAN D. COHEN (TELEPHONICALLY)

23

24

25

1   VERMONT ATTORNEY GENERAL'S OFFICE

2        Attorneys for VT Department of Financial Regulation

3        89 Main Street, Third Floor

4        Montpelier, VT 05620

5

6   BY:  JENNIFER ROOD (TELEPHONICALLY)

7

8   ALSO PRESENT TELEPHONICALLY:

9   JOEL ANTHONY

10   TRISTAN DIAZ

11   NICOLE BARSTOW

12   AARON BENNETT

13   FRANK BERTAMS

14   OCTAVE J. BOURGEOIS

15   JOHAN BRONGE

16   VERA BROWN

17   BERNIE CLICK

18   IMRAN CHAUDRY

19   EDMOND CHIU

20   MAYO CID

21   MICHAEL CONLON

22   LAFAYETTE A. COOK

23   CARL COTE

24   CAMERON R. CREWS

25   GEAN CARLOS DE OLIVEIRA BRINKER

1   JOSEPH DIEUJUSTE

2   DANIEL J. DION

3   SIMON ELIMELECH

4   DEREK FEAGIN

5   CHRIS FERARRO

6   ALEXANDER FERNANDEZ

7   FORREST L. FORMSMA

8   CHASE MARSH

9   JAMES F. LATHROP

10   KATHERINE AIZPURU

11   NELLY ALMEIDA

12   JULLEN ARSENAULT

13   CHRIS BECIN

14   RICHARD ARCHER

15   JUDSON BROWN

16   ANDREW G. DIETDERICH

17   JAMES ENGEL

18   PETER G. FUENTES

19   BRIAN D. GLUECKSTEIN

20   VINCENT GOETTEN

21   BRUNO GOMES

22   RAMON GONZALES

23   LUCAS J. HOLCOMB

24   PHILIP HARDING

25   VICKY HUANG

Page 15

1    JON IANDONISI

2    JANKO JANOVIC

3    RAUL JIMENEZ

4    KATHERINE JOHNSON

5    ELIZABETH JONES

6    GREG KACZKOWSKI

7    DAN KAPLAN

8    ROBERT M. KAUFMANN

9    JOHN R. KEMENOSH

10   TUKISHA KNOX

11   ROSS M. KWASTINIET

12   MEI PO KWOK

13   SMILE LASISI

14   RICHARD G. LASSITER

15   DAN LATONA

16   JOE LEHRFELD

17   RUBAN LOPEZ

18   DAVID LOS ARCOS CARCAMO

19   JESSE LUND

20   LAURA LY

21   SARAH BETH MARONPOT

22   MATTHEW MEEHAN

23   ERIK MENDELSON

24   TOM MERCURI

25   CHRISTOPHER L. MOBLEY

Page 16

1    MICHAEL D. MORRIS

2    JOSHUA K. NWOSU

3    LAURIE-ANN O'CONNOR

4    CHRISTOPHER PAGNANELLI

5    DIA PARKER

6    MILIN PATEL

7    SAMIR PATEL

8    MARC PUNTUS

9    TOMASZ PYTEL

10   CURTIS RESTA

11   SILVESTRE RAMOS

12   DAMIEN RAYMOND

13   ABIGAIL RYNA

14   AACELI SANCHEZ

15   KRISZTIAN SANDOR

16   NAIDU A. SANDRANA

17   DAVID SCHNEIDER

18   NOAH M. SCHOTTENSTEIN

19   WILLIAM D. SCHROEDER

20   MICHAEL SHAM

21   LUIS SILVA

22   CATHERINE STEEGE

23   JEROME STEWART

24   ANDREA STRIANESE

25   KEITH SUCKNO

```
 1   JOSHUA SUSSBERG

 2   MICHAEL TARSI

 3   VICTOR L. UBIERNA DE LAS HERAS

 4   HEMANT UPADHYAYA

 5   TONY VEJSELI

 6   ALAN WOHLMAN

 7   ANDRE WYSS

 8   MELANIE YANEZ

 9   WAJOHN YAO

10   LILY YARBOROUGH

11   JESSE YUAN

12   JEFFREY ZATS

13   ESME CHIN

14   RYAN WYMN LEWIS DAVIES

15   CJ MILLER

16   RICHARD PHILLIPS

17   JOE I. ROSA

18   KAI TANG

19   TODD ABRAHAM

20   LISA FAUCHER

21   TAYLOR HARRISON

22   CHRISTIAN HUNKELER

23   KEVIN M. MANUS

24   DONALD POYNTER

25   KADHIM SHUBBER
```

Page 18

```
 1   MATTHEW W. SILVERMAN

 2   KAILA ZAHARIS

 3   WILLIAM R. BALDIGA

 4   EMMANUEL ALBINO

 5   SAMUEL D. ARGIER

 6   JESUS AYALA, JR.

 7   NIKOLAUS AZPILICUETA

 8   NEGISA BALLUKU

 9   BRIAN BARNES

10   MALCOLM M. BATES

11   ROBERT BEAULAC

12   ANDREW BEHLMANN

13   BEN R. BEN EADES

14   CHERYL BLERBAUM

15   BRIANNA B. BILTER

16   ED G. BIRCH

17   REED BOERBOOM

18   JARED C. BORRIELLO

19   JOSEPH BOTROS

20   JEFFREY BRADIAN

21   PHILIP BRENDEL

22   PAUL BREUDER

23   NURALDEEN BRIFKANI

24   ADAM BRISTOW

25   MICHAEL P. BROADHURST
```

Page 19

1   JOHN F. CARVALHO

2   AMY CASTOR

3   OMAR CASTRO DELFIN

4   CAROLYN CHAMBERLAYNE

5   EDWARD CHAMPIGNY

6   ERIC CHAN

7   RICKIE CHANG

8   ELLE CHOI

9   ROB CHRISTIANSEN

10   LIEW ENG CHUAN

11   GEOFFREY CIRKEL

12   DAKEN COLEMAN

13   ROBERT J. COMINOS

14   MIA E. COOPER

15   SCOTT CRAIG

16   OONA CRUSELL

17   VTOR CUNHA

18   PAUL CUPP

19   RANIERO D'AVERSA

20   IMAM ADAM ADAM DABAJA

21   DAVID DALHART

22   KENNETH DARSCHEWSKI

23   STEFFAN DAVIES

24   CURT L. DELL

25   ZARYN A. DENTZEL

1   DAVID J. DERAN

2   JASON DIBATTISTA

3   STEVEN DIODONET

4   SUMIT DUA

5   SCOTT DUFFY

6   DREW DUFFY

7   IRINA DUKHON

8   JOHN P. DZARAN

9   JANELL ECKHARDT

10   DANIEL EGGERMANN

11   DAVID AVERY FAHEY

12   DAVID FEINMAN

13   MARCIA G. FLECK

14   EMMA FLEMING

15   WILSON FORERO

16   MICHAEL FORTWENGLER

17   WILLIAM FOSTER

18   DEBORAH FRANKEL

19   DOUGLAS D. FREEMAN

20   LARRY FULTON

21   DARIUS GHEORGHE

22   REBECCA GALLAGHER

23   UTSAV GHOSH

24   BRADLEY GIARDIELLO

25   RYAN GILLIGAN

Page 21

1    RYAN GOLDSTEIN

2    UDAY GORREPATI

3    THOMAS HALL

4    PHILIPPE HEGI

5    JULIE HENRY

6    JEREMY HILL

7    ANDREW HINE

8    DAVID HOLLERITH

9    KYLE HOLZHAUER

10   CHRISTIAN DARIUS HUNKELER

11   ANA LUCIA HURTADO

12   MAX JACKSON

13   ROBERTO JACOBS

14   ROBIN JACOBS

15   ALI JAMSHID FAR

16   HECTOR JARRET

17   AROON JHAMB

18   LEIGH JOHANNSEN

19   MEVIN JOSHI

20   JAME JUJ

21   DAVID KAHN

22   CHEREE KAHRS

23   COLTON KAISER

24   KELLEE KAPLAN

25   BRIAN P KARPUK

Page 22

```
 1    LORETA KASH

 2    AISLINN KEELY

 3    MIKAELA KENSINGTON

 4    PHILLIP KHEZRI

 5    FABIAN MATHIAS KHNLEIN

 6    CRYSTAL KIM

 7    DIETRICH KNAUTH

 8    JEREMY FRANCIS KOO

 9    MARY KORDOMENOS

10    ERICA L. KRAVCHENKO

11    TOMAS KSTER

12    MEI PO PO KWOK

13    ISAAC R. LLEWELLYN

14    CHRISTOPHER LACKEY

15    JOSEPH LALIA

16    JEAN-PHILIPPE LATREILLE

17    MIKE LEGGE

18    KAREN LEUNG

19    CHEYENNE LIGON

20    MAX LINDER

21    MARK LINDSAY

22    JESSICA LJUSTINA

23    GINA LOCKWOOD

24    PATRICK LONEY

25    EDMUNDO LOPEZ
```

1   JOHN LY

2   DAVE MALHOTRA

3   KEVIN M. MANUS

4   NAKISO MAODZA

5   KEVIN MARCELISSEN

6   JEREMY MARONPOT

7   KYLE MASON

8   JASON DEON MAYHEW

9   BRIAN T. MCGARRY

10   JAMES MCNAMARA

11   ARJUN MEHRA

12   ALEXANDER MICHAELS

13   RICHARD CHESTER MINOTT

14   TIMON MITRAKAS

15   MICHAEL MOWRY

16   VIK NAGPAL

17   ERIC NEMETH

18   JASON G. NEW

19   NANCY NGUYEN

20   PAUL NIEHE

21   PAUL OCONNELL

22   RICHARD E. OSWALD

23   SHANE C. OWENS

24   LAWRENCE PORTER

25   HSIN-CHIEH PAN

1   JORDYN PAPERNY

2   PETER PATZAK

3   MONICA A. PERRIGINO

4   KHAI PHAM

5   HANS POLZMACHER

6   DONALD POYNTER

7   RYAN PRAMER

8   LALANA PUNDISTO

9   RICARDO R. RAT

10   LAUREN A. REICHARDT

11   TIMOTHY REILLY

12   SPENCER M. REITZ

13   ANUBHAV RICHARDS

14   AARON RILEY

15   CHRISTOPHER D. ROBINSON

16   JONATHAN RODRIGUEZ

17   ELENA ROPAEVA

18   JACQUES ROSSOUW

19   GABRIEL ROUEN

20   ANDREW RUDOLPH

21   LUPU SERBAN

22   KENG HOCK SIAH

23   NICHOLAS SABATINO

24   JEFFREY S. SABIN

25   KAMBIZ SAFAIE

1   CAROLINE SALLS

2   DANA SANDEFUR

3   SHAI SCHMIDT

4   MARC SCHWARZ

5   ANDREW SCURRIA

6   DAVID SENES

7   RAFFAELE SENESE

8   MICHAEL SHA

9   ALEX SHLIVKO

10   KADHIM SHUBBER

11   ALI SIADATI

12   MATTHEW W. SILVERMAN

13   ALEXANDER P. SIMMONS

14   ERIC SIPPER

15   DON H. SMITH

16   BRAD SORENSEN

17   GEORGE STANBURY

18   PAUL STAPLETON

19   COURTNEY B. STEADMAN

20   JASON STONE

21   PAUL STORVICK

22   ADAM SWINGLE

23   KEYAN TAJI

24   BRIAN TICHENOR

25   GREGORY TOLLIS

Page 26

1    PAIGE TORTORELLI

2    ANHMINH TRAN

3    ELVIN TURNER

4    FEMKE VESSIES

5    ERIC VOIGTSBERGER

6    REBECCA WHITE

7    CARL N. WEDOFF

8    MARTIN WILLIAMS

9    HIRAM WILLIAMSON

10   MORGAN WILLIS

11   JASON S. WISEMAN

12   IAN WITTKOPP

13   ALEX WOLF

14   BENNY YIU WONG

15   FENGLIANG WU

16   MER FARUK YAZ

17   NATHAN YEARY

18   ANNE YEILDING

19   TAK YEUNG

20   DREW ZERDECKI

21   JARNO BERG

22   ALLAN VAN DER MEER

23

24

25

1                    P R O C E E D I N G S

2              CLERK:  Starting the recording for October 20,

3       2022 at 10:00 a.m.  Calling Celsius Network, LLC, Case No.

4       22-10964; Celsius Network, Limited v. Stone, et al, Case No.

5       22-01139; and Celsius Network Limited v. Prime Trust, LLC.,

6       Case No. 22-01140.

7              All right.  I see we have some of the conference

8       rooms.  Is anyone in the conference rooms yet that are

9       making an appearance this morning?  All right.  Sorry, I

10      can't hear you.

11             MS. STADLER:  Hi, it's Katie Stadler.

12             CLERK:  Hello.  Good morning, Katie.  If you could

13      just give your appearance for the record, please.

14             MS. STADLER:  Katherine Stadler, Godfrey Kahn,

15      appearing on behalf of the proposed fee examiner.

16             CLERK:  Thank you very much.  And is Chris Sontchi

17      also appearing this morning?

18             MS. STADLER:  He will be, yes.

19             CLERK:  All right, thank you.

20             MS. STADLER:  And can I ask you a question because

21      I have the naming convention that Judge Swain asks for in

22      the Puerto Rico proceeding.  And normally, I'm able to

23      change that, but it's showing up with my same screen name.

24      Oh, there's Judge Sontchi.

25             CLERK:  Okay.  So you should be able to -- there

1    should be three dots next to your name and you should be

2    able to click rename.  Is that what you were asking about?

3              MS. STADLER:  Oh, yes.

4              CLERK:  If not, I can take care of that for you.

5              MS. STADLER:  I got it.  So he just wants first

6    name, last name?

7              CLERK:  Yes, please.

8              MS. STADLER:  Okay, there we go.

9              CLERK:  Perfect.  Thank you so much.

10             MS. STADLER:  Thank you.

11             CLERK:  Chris, Mr. Sontchi, if you could unmute

12   and give your appearance.  I just want to make sure your

13   microphone works?

14             MR. SONTCHI:  Good morning.  This is Christopher

15   Sontchi, the proposed fee examiner.

16             CLERK:  All right, so you're unmuted, Chicago 6M.

17   Which conference room are you here for?

18             MR. KOENIG:  Good morning.  It's Chris Koenig from

19   Kirkland & Ellis on behalf of the Debtors.  Can you hear me

20   okay now, Deanna?

21             CLERK:  Yes, I can.  Thank you, Chris.

22             MR. KOENIG:  Thank you.  We were having some

23   technical difficulties.  We'll go on mute now.

24             CLERK:  Okay.  Just a quick question.  Are the

25   other parties from Kirkland joining through that conference

1    room or are they joining separately?

2              MR. KOENIG:  I believe everybody that's speaking

3    this morning, Deanna, will be in this conference room.  It's

4    going to be me and my partner, Dan Latona, I believe.

5              CLERK:  Thank you.

6              MR. KOENIG:  Thank you.  There will be another

7    conference room that needs to be admitted to the conference,

8    but they won't have a speaking role this morning.

9              CLERK:  Understood.

10             MR. KOENIG:  Thank you.

11             CLERK:  All right.  I see someone signed up as

12   Kirkland & Ellis.  Could you please identify who you are?

13   All right.  Dean Chapman, if you could unmute and give your

14   appearance for the record, please?

15             MR. CHAPMAN:  Yeah, good morning.  Dean Chapman

16   from Akin Gump Strauss Hauer & Feld for the Celsius Debtor

17   plaintiffs in the two pretrial conferences that are set for

18   today.

19             CLERK:  Okay.  And you're appearing on behalf of

20   Celsius Network, LLC as special litigation counsel?

21             MR. CHAPMAN:  That's correct.

22             CLERK:  All right, thank you.

23             MR. CHAPMAN:  And I see my partners, Mitch Hurley

24   and Lizzy Scott on here as well.

25             MR. HURLEY:  Good morning.  Yeah, so that's Mitch

1   Hurley with Akin Gump.  And like Mr. Chapman, I'm going to

2   be appearing on behalf of the Debtors in connection with the

3   two pretrial conferences.

4            CLERK:  Thank you.

5            MR. HURLEY:  Thank you.

6            CLERK:  Elizabeth, I just want to make sure you

7   can unmute and speak if necessary.

8            MS. SCOTT:  Good morning, yes.  Elizabeth Scott,

9   also with Akin and also special litigation counsel for the

10  pretrial conferences.

11            CLERK:  Thank you.  Someone's joined as Kirkland &

12  Ellis.  Could you just rename yourself, please, or I could

13  rename you if necessary.

14            MAN 1:  That's just the preview room and it's a

15  secondary room for the people who are just viewing and not

16  speaking.  Same group as this group.

17            CLERK:  All right.  I'll just put listen only.

18  Thank you.

19            MAN: 1  Thank you.

20            CLERK:  All right.  Keith Wofford, if you could

21  unmute and give your appearance for the record, please.

22            MR. WOFFORD:  Hello, good morning.  Keith Wofford

23  from White & Case on behalf of the Official Committee.

24            CLERK:  Okay.  Thank you very much.  Mr. Turetsky,

25  David.

```
 1              MR. TURETSKY:  Good morning.  David Turetsky of

 2    White & Case on behalf of the committee.

 3              CLERK:  Okay, thank you.

 4              MR. TURETSKY:  Thank you.

 5              CLERK:  Now who is going to be speaking first on

 6    behalf of the committee; do you happen to know, either of

 7    you?

 8              MR. TURETSKY:  It will be Greg Pesce and Aaron

 9    Colodny.

10              CLERK:  All right, thank you.

11              WOMAN 1:  Deanna, can you make me cohost, please?

12              CLERK:  Yes.  I will in a moment, Jessica.

13              WOMAN 1:  Thank you.

14              CLERK:  You're welcome.  All right, Aaron, if you

15    could unmute and give your appearance, please.  Just trying

16    to make sure your line works.

17              MR. COLODNY:  Aaron Colodny, White & Case for the

18    Official Creditors' Committee.

19              CLERK:  Thank you.

20              MR. COLODNY:  And I'm going to be sharing the

21    demonstrative today.  Is the share screen feature

22    operational on my computer?

23              CLERK:  All right.  So what you'll do is just give

24    me a que, tell me that -- or if someone could just tell me

25    that you're ready to start sharing, and then I will make you
```

Page 32

1   a cohost and you will be able to share.

2         MR. COLODNY:  Okay.  I think Greg will do it when

3   he's giving the argument.

4         CLERK:  All right.  Pardon?

5         MR. COLODNY:  I think Greg Pesce will do it when

6   he's giving the argument, give you the que, and then I'll be

7   the one that share his screen.

8         CLERK:  Okay.  Thank you very much.

9         MR. COLODNY:  Thank you.

10        CLERK:  All right, Mr. Frishberg, have you joined?

11   All right.

12        For the parties that have joined, if you're going

13   to be speaking on the record this morning and have not yet

14   given your appearance, please unmute and give your

15   appearance at this time, one at a time.

16        Good morning, Gregory.  If you could just give

17   your appearance just to make sure your microphone works.

18        MR. PESCE:  Sure.  Gregory Pesce, White & Case, on

19   behalf of the committee.  And I don't know if my colleagues

20   have joined, but Aaron Colodny and Sam Hershey will also be

21   speaking for the committee today.

22        CLERK:  All right.  Mr. Colodny, Mr. Turetsky, and

23   Mr. Wofford all gave their appearance.

24        MR. PESCE:  Super.

25        MR. COLODNY:  And then, Greg, whenever it's time

1    to do the demonstrative, just give the que and they'll give

2    me powers to put it up.

3              MR. PESCE:  Great, thanks.

4              CLERK:  All right.  For the parties that have

5    joined, if you are speaking on the record this morning and

6    you have not given your appearance yet, please unmute and

7    give your appearance at this time.

8              MS. ROOD:  Jennifer Rood, Vermont Department of

9    Financial Regulation.

10             CLERK:  Thank you, Jennifer.  All right, Daniel

11   Frishberg, are you going to speaking this morning?

12             MR. FRISHBERG:  Yes, I will be.  Daniel Frishberg,

13   pro se filer.  Thank you.

14             CLERK:  Thank you very much.

15             MR. STEEL:  Good morning.  It's Howard Steel,

16   Goodwin & Procter, on behalf of Prime Trust.

17             CLERK:  Okay.  Thank you, Howard.  All right,

18   Deborah Kovsky, are you going to be speaking this morning.

19             MS. KOVSKY:  Hi, Deanna.  I don't anticipate it

20   unless the judge has a specific question relating to the

21   withhold group.

22             CLERK:  All right.  Thank you very much.  Good

23   morning, Shoba.  If you could unmute and give your

24   appearance, please.  Again, Shoba Pillay, are you speaking

25   this morning?

1             MS. PILLAY:  Good morning.  If the Court has any

2    questions for me, I'm happy to address them, but I have

3    nothing specific to raise.

4             CLERK:  Okay.  And then Catherine, is she joining

5    as well?

6             MS. PILLAY:  Catherine from -- she might be.  I

7    think Vince Lazar is joining.  I'm not sure about Cathy.

8             CLERK:  Okay, thank you.

9             MS. PILLAY:  Thank you.

10            CLERK:  All right.  Kevin, please pause the

11   recording for now.

12            Good morning, Samuel.  If you could unmute and

13   give your appearance just to make sure you can speak this

14   morning if you need to.

15            MR. HERSHEY:  Sam Hershey from White & Case on

16   behalf of the Official Committee of Unsecured Creditors.

17            CLERK:  Thank you.  Are there any additional

18   parties that have joined that have not given their

19   appearance and are speaking on the record this morning?

20            MR. HERRMAN:  Immanuel Herrmann, pro se Celsius

21   creditor.  I plan to object to 1119, the expedited -- the

22   motion to shorten for the motion to seal, and then I'll

23   probably speak on 929.

24            CLERK:  Okay.  So when the judge gives parties the

25   ability to speak, just a reminder if everyone could raise

1    their hands and he'll get to each party one at a time.

2    He'll ask you each to unmute.  Thank you.

3              Please pause the recording.

4              Good morning, Vincent.  If you could unmute and

5    give your appearance for the record, please.

6              MR. LAZAR:  Good morning.  Vincent Lazar on behalf

7    of the examiner.

8              CLERK:  All right.  Is Carl Wedoff also joining?

9              MR. LAZAR:  Yes, I believe Carl is joining.

10             CLERK:  Okay, thank you.  All right.  Are there

11   any additional parties that have been admitted that are

12   speaking on the record this morning but have not given their

13   appearance?

14             MR. MESTER:  Good morning.  It's Josh Mester from

15   Jones Day on behalf of CDP Investments, Inc.

16             CLERK:  Thank you very much.

17             All right.  Please pause the recording for now.

18             Good morning.  Mark Bruh, are you there?

19             MR. BRUH:  Yeah.  Good morning, Deanna.  I'm

20   getting on right now.

21             CLERK:  Okay, thank you.  I can see you.

22             MR. BRUH:  Okay, thank you.  Bye-bye.

23             CLERK:  All right.  So Mark Bruh appearing on

24   behalf of the U.S. Trustee.  Mark, are Shara Cornell or

25   Linda Riffkin going to be joining?

1          MR. BRUH:  Shara, Miss Cornell, will definitely be

2     joining the hearing.  I don't know about Miss Riffkin.

3          CLERK:  Okay, thank you.

4          MR. BRUH:  Okay.

5          CLERK:  All right.  For the participants that have

6     joined, if anyone is speaking on the record this morning and

7     has not given their appearance yet, please unmute your line

8     and give your appearance, please.

9          Hello, Brian Masumoto, are you just --

10          MR. MASUMOTO:  Good morning.  This is Brian

11     Masumoto.

12          CLERK:  All right.  Are you speaking?

13          MR. MASUMOTO:  I'll probably be listening.  I

14     don't anticipate speaking at this time.

15          CLERK:  Okay.  Thank you, Brian.  Please pause the

16     recording.  All right.  Are there any parties that have not

17     given their appearance yet but are speaking on the record?

18          MS. MILLIGAN:  Good morning.  This is Layla

19     Milligan with the Texas Attorney General's Office.

20          CLERK:  All right.  Thank you, Layla.  Is Abigail

21     Ryan also joining?

22          MS. MILLIGAN:  I believe she may be joining, but I

23     will be presenting comments on our behalf today.

24          CLERK:  Thank you.  All right, Linda Riffkin, I

25     see you also joined.  It's my understanding you're not

Page 37

1     speaking this morning; is that correct?

2               MS. RIFFKIN:  That's correct.

3               CLERK:  Thank you.

4               MR. ADLER:  Hi, Deanna.  It's David Adler from

5     McCarter & English on behalf of certain borrowers.  I don't

6     expect to be speaking today, but I thought I should put in

7     my appearance just in case.

8               CLERK:  Thank you, appreciate that.  All right,

9     please pause the recording.

10              Andrew Leblanc, are you speaking this morning on

11    the record?

12              MR. LEBLANC:  Likely, yes, although Mr. Dunne from

13    Milbank will be joining momentarily, and he'll take the lead

14    for us.

15              CLERK:  Okay.  If you could just state who you're

16    appearing on behalf of.

17              MR. LEBLANC:  Yes.  Andrew Leblanc of Milbank on

18    behalf of certain preferred equity holders, Community First

19    Partners, Celsius SPV investors, and Celsius new SPV

20    investors.

21              CLERK:  Thank you.

22              THE COURT:  Deanna, are you able to hear me?

23              CLERK:  Yes, I am, Judge.

24              THE COURT:  Thank you.

25              CLERK:  All right.  Are there any additional

1    participants that have joined that are speaking on the

2    record this morning but have not given their appearance yet?

3              Good morning, Shara.

4              MS. CORNELL:  Good morning.  How are you?

5              CLERK:  Good.  Are you listening this morning or

6    speaking?

7              MS. CORNELL:  I'm speaking this morning.  Shara

8    Cornell on behalf of the Office of the United States

9    Trustee.

10             CLERK:  All right, thank you.

11             MS. CORNELL:  Thank you.  I appreciate it.

12             CLERK:  Are there parties that have joined that

13   have not given their appearance and are speaking this

14   morning?  All right.  And any participants that have joined

15   that are speaking on the record this morning and have not

16   given their appearance yet?

17             MR. DUNNE:  Yes, hi.  It's Dennis Dunne from

18   Milbank.  I will be speaking today on behalf of Community

19   First Partners.

20             CLERK:  All right, thank you.

21             MR. KOTLIAR:  Hi, good morning.  I haven't given

22   my appearance yet.  This is Brian Kotliar of Togut, Segal &

23   Segal.  I don't expect to speak, but if something comes up,

24   then I may have to.

25             CLERK:  All right, thank you.  And then I believe

Page 39

1    Kyle Ortiz joined as well.

2              MR. ORTIZ:  Good morning, Ms. Anderson, yes.  And

3    like my colleague, don't anticipate needing to speak and

4    hope to be in listen mode today.

5              CLERK:  All right, thank you.

6              MR. ORTIZ:  Thank you.

7              MS. COHEN:  This is Hollace Cohen of Fisher &

8    Broyles on behalf of Vincent Goetten.  I am one of the

9    objectors, so I expect to perhaps say something.

10             CLERK:  All right.  Thank you very much.  For

11   anyone that is going to respond or wants to speak, if you

12   could just use the raise hand function when that matter is

13   actually being considered and when the judge is taking --

14   allowing parties to speak at that time, and then he will

15   orderly allow each party to answer.

16             Everyone, I'm trying to do two things at once,

17   so...

18             All right.  Are there any additional parties that

19   will be speaking on the record that have not given their

20   appearance yet?  Once again, any participants that have

21   joined that are speaking on the record and have not given

22   their appearance yet?

23             MR. ROCHE:  Kyle Roche on behalf of KeyFi and

24   Jason Stone.

25             CLERK:  All right.  And you're appearing in which

1    case?  If you could just specify the case and who you're

2    appearing on behalf of.

3              MR. ROCHE:  Yes.  The case is the adversary

4    proceeding, Celsius Network v. Jason Stone and KeyFi, Inc.,

5    and I'm appearing on behalf of Jason Stone and KeyFi, Inc.

6              CLERK:  Thank you very much.  All right.  Any

7    other parties that have joined and have not given their

8    appearance yet and are going to speak?  All right.

9              I see some parties joined from the Federal Trade

10   Commission.  Are you going to be speaking, Katherine?

11             MS. AIZPURU:  I apologize, Ms. Anderson, I was

12   muted.  This is Katherine Aizpuru from the Federal Trade

13   Commission.  We don't anticipate speaking today.

14             CLERK:  All right, thank you.  All right.  Has

15   counsel joined on behalf of Prime Trust yet?

16             MR. STEEL:  Good morning, Deanna.  It's Howard

17   Steele, Goodwin, for Prime Trust.

18             CLERK:  Okay.  And is Jamie Lathrop going to be

19   joining?

20             MR. STEEL:  No, just me.

21             CLERK:  Okay, thank you.

22             MR. STEEL:  Thank you.

23             CLERK:  All right.  Is there anyone that we're

24   waiting for to anyone's knowledge that has not joined and

25   will be speaking today?  All right.  Please pause the

1    recording for now.

2              We're going to get started.  Just a brief

3    announcement before we do.  Parties are strictly prohibited

4    from making any recording of court proceedings, whether by

5    audio, video, screenshot, or otherwise.  Violation of this

6    prohibition may result in the imposition of monetary and

7    non-monetary sanctions.  The clerk of the court maintains an

8    audio recording of all proceedings, which constitutes the

9    official record.

10             Judge, would you like to begin?

11             THE COURT:  Yes, I would.  Thank you very much and

12   good morning, everybody.  We have a rather full agenda this

13   morning.  What I would like to do, I'm going to set some

14   time parameters for several of the motions today.  As in the

15   past hearings, I would like to try and give an opportunity

16   for those who want to be heard to speak, but that may not be

17   possible today.

18             So there have been many, with respect to some of

19   the motions, there have been many pleadings that have been

20   filed, objections or limited objections.  And what I want to

21   make sure we avoid is duplication of argument, so I may well

22   request argument from various people along the way and we'll

23   see whether we can fit further argument within the time

24   parameters.

25             So before getting to what's in the agenda, there

1    have been several matters that have been attempted to be

2    added to the agenda, but have not followed the procedures

3    required, specifically with respect to Mr. Frishberg's

4    motions, he's filed several, and he's requested that the

5    Court shorten time for those motions to be heard today.  I

6    believe my courtroom deputy was going to try and

7    communication with Mr. Frishberg yesterday for these

8    hearings.  His request to shorten time is denied.

9            If he wishes to have matters heard, he will have

10   to follow the procedure that everyone else does, which is

11   namely to speak with my courtroom deputy, request a hearing

12   date, has to follow the required notice periods, so his

13   motions will be heard in due course if they're properly

14   noticed, but they will not be heard today.

15           Secondly, I've seen the request to add to the

16   agenda, a request for the appointment of a fee examiner, and

17   my understanding is that the Debtor and the committee and

18   the U.S. Trustee have reached an agreement with respect to

19   that issue, so I do want to take that up as well.  We'll

20   take it up after -- and I see Mr. Sontchi, who is the

21   proposed fee examiner.

22           We'll take that up after I hear -- I want to start

23   with the motion for the appointment of the official

24   preferred equity committee.  We'll then move to the bidding

25   procedures motion.  With respect to the motion to appoint

1    the official preferred equity committee, I've reviewed all

2    of the papers.  I'm going to limit the argument on that

3    motion to 20 minutes: 8 minutes in support, 10 minutes in

4    opposition, and 2 minute reply.  I think both the Debtor and

5    the -- well, excuse me -- the Debtor and the committee have

6    opposed it.

7              Mr. Dunne, are you arguing in support of the

8    motion?

9              MR. DUNNE:  Yes, I am, Your Honor.

10             THE COURT:  So why don't you begin.

11             MR. DUNNE:  Okay.  For the record, good morning,

12   Your Honor,  Dennis Dunne of Milbank on behalf of Community

13   First Partners.  And we are here this morning, as Your Honor

14   indicated, on our motion for the Court to appoint an

15   official committee of preferred equity holders under Section

16   1102.

17             The Williams case sets out the standard.  I'm not

18   going to go through the factors now, but I think that we

19   have satisfied each of the factors, which I'll get to after

20   just a brief recitation of what I think are the salient

21   facts: (a) Celsius is a complicated case with an elaborate

22   business structure.  It is presenting and will present novel

23   issues for the Court to address.  And more specifically, the

24   case is unusual because there's no debt for borrowed money

25   on its balance sheets.  There's no bank debt, no bond debt.

Page 44

1    The creditors are mostly -- not completely -- but mostly the

2    customers and the preferred equity was effectively the debt,

3    but it came in as preferred equity.

4           These dynamics create kind of the spoke threshold

5    issues for Your Honor that need to be decided and require a

6    fast and fair resolution.  An official committee for the

7    preferred stockholders will ensure an effective adversarial

8    process, which I will describe in a minute.

9           The company's prepetition balance sheet and

10   financial statements all showed the value of the mining

11   entity, the loan portfolio in GK8 flowing to the preferred

12   equity, untouched by customer claims which reside in the

13   customer entity, Celsius Network, LLC.

14          That reality is under siege now, Your Honor, by

15   several positions espoused by the customer committee in

16   which the Debtors' advisors may or may not agree with, but

17   the official committee is, for all intents and purposes, a

18   customer committee that are parties in and strong advocates

19   for the customers and they need a counterweight that is

20   cloaked in the mantle of fiduciary duties to have adequate

21   representation for the preferred, as well as an effective

22   joining of the issues.

23          This case is also different than Voyager down the

24   hall from you, Your Honor.  It's more complex than the other

25   crypto cases.  Unlike Voyager, Celsius owns business lines

Page 45

1    and assets apart from the customer deposits and there's four

2    principal examples of it.  You have the customer entity, but

3    in addition, you have the long portfolio, the mining rigs,

4    and GK8, which is an Israeli self-custody business.

5            The investments of the Series B preferred equity

6    was made approximately six months prior to the filing.  The

7    holding company, the U.K. entity, raised over 690 million

8    from approximately 30 investors, more than half of whom are

9    individual, Your Honor.

10           And the equity valuation -- this is important for

11   representation purposes -- at the time was nearly $3.5

12   billion, meaning the nearly $700 million investment was not

13   a purchase of control of the company, so the founders remain

14   in control of the company, of the board, the common stock,

15   corporate governance.

16           To date, Your Honor, the preferred equity

17   securities have not received a penny back on their

18   investment: no dividend, no return of capital, not a cent.

19           The investment was focused not on the depositor

20   business or value of the customer entity, but on the

21   buildout of the mining company and the acquisition of GK8,

22   and the value of those flowed up to the U.K. parent without

23   hitting the customer claims.  And I say this because it's

24   not a contention of an advocate for the preferred equity in

25   a Chapter 11, it's more than that; it's the position of the

1   company prior to the filing.  All financial statements, SEC

2   submissions, and representations to investors were

3   consistent with this.

4           The complexity of the case.  No one disputes that

5   this case is complex, so I think that that prong's

6   satisfied, but I'd move on to the next one, which is we're

7   not adequately represented by the key stakeholders in the

8   case.

9           Judge Wiles recently denied an official equity

10  committee in Revlon, and he did so because he thought that,

11  in part --

12          THE COURT:  I think that was Judge Jones.  That

13  was Judge Jones in Revlon.

14          MR. DUNNE:  I'm sorry, Your Honor, you're right.

15  And, in part, because the efforts of the Debtors and the UCC

16  there would benefit equity.  How?  Those estate fiduciaries

17  were looking for ways to unlock value and increase the

18  amount of assets in the estate.

19          That is simply not the case here.  This case is

20  more about allocation of value than maximization efforts,

21  and the official committee here is extremely partisan and

22  for the customers.  I say that because, to its credit, they

23  don't shy away from that fact; they embrace it.  They are

24  looking to, in fact, load up one type of unsecured claim at

25  all the entities at the expense of others.

```
 1              We represent official committees all the time,

 2    Your Honor, and, you know, you struggle with the conflicting

 3    fiduciary duties; meaning, if you were a taxing authority

 4    with unsecured claims against the entire corporate family or

 5    an employee with unsecured claims with the U.K., you'd be

 6    surprised to hear that your fiduciary believes all the

 7    customer claims rank pare with your claims at every entity.

 8              THE COURT:  Mr. Dunne, the fact that the Debtor

 9    may and the committee will take a position contrary to the

10    one that you seek to take on behalf of the preferred

11    holders, that doesn't automatically entitle you to a

12    preferred equity committee, does it?

13              MR. DUNNE:  No.  I'm raising this to say that very

14    often, Your Honor --

15              THE COURT:  I mean, you're obviously a very able

16    advocate.  I have no doubt that with or without a committee,

17    I will hear from you and have very serious arguments raised.

18    You know, the Debtor so far has indicated that in indicating

19    that all customer claims are against each entity, they're

20    reserving their rights and make clear that that isn't

21    necessarily their position down the road.  It may well be

22    for the creditors' committee.  But the fact that there are

23    disputes as to which entity the unsecured creditors' claims

24    may lie does not equate into the need for another committee.

25              MR. DUNNE:  Let me address that in two ways, Your
```

Page 48

1    Honor.  One is that (a) it's unusual for the estate

2    fiduciary to be making these types of parochial arguments.

3    Why?  Because in the typical Chapter 11, you'd have bond

4    debt that would be there and those conflicting fiduciary

5    duties would circumscribe the action.

6           The second reason, and I want to get into this

7    more importantly, is the level of engagement that we've had

8    to date, right?  The Debtors have also said on the record

9    they expect to work in partnership with the customers and

10   the customer committee.  They've never said that about us.

11   They have --

12          THE COURT:  Are you feeling slighted, Mr. Dunne?

13          MR. DUNNE:  We feel that definitely we would have

14   adequate representation if we were an estate fiduciary

15   because we wouldn't be disregarded like -- let me give two

16   examples.  The UCC announced on the record a few hearings

17   ago that they had been in conversation with the Debtors and

18   the Debtors intended to schedule the customer claims at

19   every entity.

20          THE COURT:  And they reserved all of their rights

21   with respect to the issue of whether the customer claims

22   properly should be allowed against each entity.  I mean,

23   they have not -- has the Debtor taken a position?

24   Certainly, it's contrary to the position they've taken in

25   everything I've read.

1           MR. DUNNE:  They did reserve the right.  The point

2    I'm getting at, Your Honor, is that (a) if we were a

3    fiduciary, they would have talked to us before they made

4    that announcement.  You can say, okay, but they reserved

5    anyway.  But the answer is we would be in a much more

6    expedited position.  Why?  We gave them a bunch of counter-

7    factuals after hearing about that; that they should have

8    considered, you know, weeks earlier.  That would have led

9    them to tee up these issues in a way that we know it has to

10   be adjudicated weeks earlier.  And the lack of, you know,

11   formal official committee status is resulting in unnecessary

12   delays while we're --

13           THE COURT:  I'll give you another two minutes, Mr.

14   Dunne.  Are there any other -- are there any cases that you

15   want me to look at?  But, I mean, I've read all the papers

16   at this point.  I understand the issues that you've raised

17   about the appointment of an preferred equity committee, and

18   I understand the arguments that have been made by the Debtor

19   and the committee.

20           Is there something that's not in the papers that

21   you want to raise?

22           MR. DUNNE:  What I view is different here, Your

23   Honor, is that this isn't a case where, you know, the equity

24   -- the preferred equity is coming before Your Honor and

25   saying, yes, we're behind billions of dollars of debt for

1    borrowed money and we expect that the valuation at the end

2    of the day is going to put us in the money.

3            We believe we're in the money today and all the

4    prepetition documents showed it and that what's happening is

5    that there's actions being taken (crosstalk) --

6            THE COURT:  Isn't the question under the case law

7    whether the position that you are taking is really

8    adequately represented by you and perhaps others

9    representing preferred equity.  I mean, they're a major

10   economic stakeholder with absolutely first-rate counsel who

11   are not going to be shy about asserting their positions,

12   whether in the form of objections to motions or adversary

13   proceedings, whatever.  I mean, your constituency is very

14   well represented and may ultimately prevail, Mr. Dunne.

15           The issue is whether a committee is needed to be

16   able to assert that position.

17           MR. DUNNE:  I know we're running out of time.

18   I'll just address that last point, Your Honor, in two ways.

19   One, we cited a number of cases where official committees

20   were appointed, notwithstanding the fact that everything

21   you've said was true, that there was experienced

22   sophisticated counsel representing a subset of the

23   stockholders, Kodak being one of them.

24           Here, it's not necessarily true that all the

25   individual stockholders and more than half of the preferred

1    are held by individuals will necessarily benefit from our

2    work.  They may if we litigate to the end.  It may be that,

3    you know, we decide to go in a different direction, or you

4    cut a settlement that might not result in class-wide

5    distributions, and they would benefit from it.  That's my --

6              THE COURT:  I have your arguments, Mr. Dunne.  Let

7    me hear from the other side.

8              MR. DUNNE:  Okay.  Thank you, Your Honor.

9              THE COURT:  I'm giving a total of 10 minutes and

10   it's going to be how -- Mr. Pesce, have you talked with the

11   Debtors about who wants to take the main argument on this?

12   Whoever wants to go first, but I'm only allocating a total

13   of 10 minutes for it.

14             MR. KOENIG:  Your Honor, it's Chris Koenig for the

15   Debtors from Kirkland & Ellis.  Can you hear me okay?

16             THE COURT:  Yeah, go ahead, Mr. Koenig.

17             MR. KOENIG:  Your Honor, I'll endeavor to be brief

18   so that Mr. Pesce has time to argue as well.

19             Your Honor, you clearly have read the briefs in

20   great detail, so I just want to focus on the issue of

21   adequate representation.  We object to the appointment of

22   the committee.  We believe that they're already adequately

23   represented.

24             Section 1102 requires that the appointment be

25   necessary.  The case law is clear that this is a difficult

1    standard to meet.  I'd point Your Honor to Oneida where the

2    Court explained that the standard is that the equity holders

3    must be unable to represent their interests in the

4    bankruptcy case without an official committee.

5              Likewise, the Kodak and Spansion courts made clear

6    that even if there was a factual finding that the debtors

7    and the creditors' committee were not representing equity

8    holders, as Mr. Dunne is argument, those courts nonetheless

9    found that the ad hoc committee of equity holders is well

10   organized, well represented by counsel, and adequate to the

11   task of representing its interests without official status.

12   That same analysis should be applied here.

13             The movants hold a super-majority of the Series B

14   preferred, 87 percent.  The movants are sophisticated

15   investors.  They're represented by two global law firms that

16   routinely represent clients in the largest and most complex

17   Chapter 11 cases, and they've been involved in these cases

18   from the very beginning.

19             Mr. Dunne has appeared at numerous hearings.  He

20   and his colleagues have sent comments to numerous orders,

21   including the mining Bitcoin order, the cash management

22   orders, and many others.  We have taken their thoughts and

23   views into consideration, as we noted in the papers, after

24   Mr. Dunne and his colleagues reached out to the Debtors to

25   make their views known on the claims issue.

Page 53

```
 1              The special committee and the Debtors' attorneys

 2      met with Mr. Dunne and his colleagues for an hour.  That

 3      level of engagement is unprecedented, and it shows serious

 4      engagement with the equity holders in this case.  The fact

 5      that the special committee did not wholesale adopt Mr.

 6      Dunne's views is not any evidence that they did not take his

 7      views into account.  It just means that, you know, the

 8      special committee did not happen to agree with the views

 9      that Mr. Dunne was espousing, but it does not mean that Mr.

10      Dunne is not adequately represented or that he cannot

11      adequately represent the views of his clients.

12              So just really briefly and then I can turn it over

13      to Mr. Pesce.  I just want to address a few things that Mr.

14      Dunne said.  He focuses on the fact there's no bond or bank

15      debt here.  But what is also unusual about this case is that

16      there are billions of dollars of customer debt here and

17      those are significant claims and significant stakeholders in

18      this case.

19              You know, Mr. Dunne appears to take issue with the

20      fact that at hearings, the Debtors focused on their

21      customers.  Of course, Your Honor, the Debtors' customers

22      are necessary to the go forward business.  Mr. Dunne's

23      clients are sophisticated hedge funds.  They do not require

24      the same sort of public commentary.  You know, we engaged

25      with them, as I mentioned before, you know, behind closed
```

1    doors and we have taken their views into account, and we

2    will continue to do so, and I think the record reflects

3    that.

4              THE COURT:  All right, thank you.

5              MR. KOENIG:  Your Honor, that's all I have.

6              THE COURT:  Let me hear from Mr. Pesce.

7              MR. KOENIG:  Thank you.

8              THE COURT:  You're muted, Mr. Pesce.  You're still

9    muted.

10             MR. PESCE:  Apologies for that.  We, likewise,

11   oppose the appointment of an official committee here.

12             I want to really focus, like Mr. Koenig, on

13   whether the preferred equity is adequately represented.  The

14   statement that preferred equity is not adequately

15   represented here is really, frankly, egregious and

16   unprecedented.

17             The special committee is running the

18   restructuring.  One of the two members of the special

19   committee, Mr. Alan Carr, who is a well-established, well-

20   known fiduciary and restructuring cases, was designated by

21   WESCAP, the large, preferred equity holder.  So one of the

22   two members of the special committee was literally appointed

23   by the preferred equity.

24             Second, just in terms of who else can represent

25   the interests of preferred equity, as you said, Mr. Dunne

1    and Jones Day are able to do that very well themselves.

2    Just to put a few numbers in perspective here: CDBQ, Jones

3    Day's client, represents it has nearly $400 billion of

4    capital under management; WESCAP represents that it has

5    nearly $9 billion of capital under management.  They've very

6    able to pay professional fees; they do not need to pass

7    those on to the estate.

8              And to the point of whether an official committee

9    is necessary here.  This case in recent weeks has really

10   been dominated by the question of the custody issue.  There

11   is no official custody.  There is no official withhold

12   committee.  Those constituents are acting through ad hoc

13   groups that forced the issue and those ad hoc groups are now

14   engaged with us.  We welcome dialogue with Mr. Dunne, as I'm

15   sure the Debtors do, if Mr. Dunne and Jones Day retained

16   their unofficial status.

17             And finally, to the extent there is any question

18   regarding any kind of secret pact or allegiance between the

19   Debtor and the committee, that's obviously incorrect.  The

20   Debtor and the committee, it's not always open and public,

21   but we have lots of disagreements; we talk a lot.  They

22   don't agree with everything we say; we don't agree with

23   nearly everything they say.

24             And then finally, just quickly on the solvency

25   points.  This is really not an issue for today.  We only saw

1   some of these documents yesterday.  I'm going to avoid

2   sharing the demonstrative that we filed but suffice to say

3   the Debtor has scheduled claims for the customers and the

4   intercompany claims.  They're allowed under Section 502

5   until a party objects.  Mr. Dunne or Jones Day is free, or

6   any other party for that matter, is free to object.  But

7   unless and until that happens, they are allowed claims.

8              And then finally just to highlight one issue in

9   particular on the intercompany claim.  During the 341

10  meeting this week -- I'm not sure if Your Honor had the

11  opportunity to listen in -- it was revealed --

12             THE COURT:  I'm not allowed to.

13             MR. PESCE:  Oh, okay, there we go.  Well, I'll put

14  it on the record then.  During the 341 meeting, the CFO, now

15  acting CEO, Mr. Ferraro, put on the record that Celsius

16  Network, Ltd. -- that's the entity where the preferred

17  equity hold their instruments -- is holding several billion

18  dollars -- that's billion with a B dollars -- of

19  cryptocurrency.

20             It's inexplicable that Celsius Network, Ltd. would

21  be holding billions of dollars of cryptocurrency if the

22  customers do not have claims there or, at a minimum, that

23  the entity where the customers -- an entity where the

24  customers have claims have claims against Celsius Network,

25  Ltd. that would be senior to the preferred equity.

1          THE COURT:  Let me stop you on there, Mr. Pesce.

2    I don't have a transcript from that.  I don't -- I'm not

3    sure that that really, at this point, is something I need to

4    know about for purposes of resolving this motion.

5          MR. PESCE:  Got it.

6          THE COURT:  Any last points you want to make, Mr.

7    Pesce?

8          MR. PESCE:  And finally, that's it.  We oppose the

9    committee.

10         THE COURT:  All right.  Mr. Dunne, you filed a

11   motion for leave to file under seal unredacted documents I

12   guess you got from the Debtors.  I wanted to ask Mr. Koenig

13   some questions about it, and I'll give you a chance to very

14   briefly address it.

15         Mr. Koenig, among the documents that Mr. Dunne has

16   asked to be able to file under seal is an SEC filing that

17   was never public and also two presentations, a January 22

18   presentation and a Fall '21 presentation.  Mr. Koenig, are

19   you familiar with what those documents are, the two -- these

20   are Celsius mining presentations from, as I said, Fall '21

21   and January '22.

22         MR. KOENIG:  Your Honor, again for the record,

23   Chris Koenig for the Debtors.

24         Yes, Your Honor, we're familiar with those

25   documents.  Mr. Dunne's colleagues reached out to us

Page 58

1    regarding those documents prior to filing their motion.

2              THE COURT:  And let me ask you this question:  To

3    whom were those documents provided?

4              MR. KOENIG:  I believe that they were provided to

5    certain investors or potential investors in the company.

6    They were provided on a conf- --

7              THE COURT:  Well, did each of those parties who

8    received a copy of those documents sign confidentiality

9    agreements?

10             MR. KOENIG:  Your Honor, I'm not certain standing

11   here today whether they did or they didn't.  But I'm happy

12   to --

13             THE COURT:  By tomorrow at noon, please file a

14   declaration specifically addressing -- I'm not focused on

15   the S-1.  I'm really focused on these two presentations that

16   were made to investors or potential investors; the one being

17   from -- the cover page is executive summary Fall 2021, and

18   the second one, cover page is January 2022 transaction and

19   business update.

20             I would like specifically addressed two whom -- to

21   each party to whom a copy was provided, whether each party

22   who received a copy signed a confidentiality agreement.  And

23   after seeing that, I will -- and also, let me ask, Miss

24   Cornell, did you receive unredacted copies?

25             MS. CORNELL:  Good morning, Your Honor.  Shara

1    Cornell on behalf of the Office of the United States

2    Trustee.  I didn't receive unredacted copies of the

3    documents and, like Your Honor, I had some reservations

4    about whether or not they should, in fact, be under seal.

5              THE COURT:  Yeah.  So, first off, I'm not sure

6    that I need to even consider those documents in connection

7    with the motion.  But I would like by Mr. Koenig by

8    tomorrow, as I say, by noon, identification of each party to

9    whom it was provided and whether each party signed a

10   confidentiality agreement with respect to the information

11   that they were given.

12             MR. KOENIG:  Understood.  We'll be sure to do so.

13             THE COURT:  And, Miss Cornell, after you see that,

14   if you want to file a short position with respect to

15   sealing, I would appreciate receiving it.  I would direct

16   you to do that.  I'd like to know what the U.S. Trustee's

17   position is.

18             Again, it may be that I decide this is not

19   something that I need to consider one way or the other with

20   respect to the pending motion.

21             I'm going to take the motion for appointment of an

22   official preferred equity committee under submission and I

23   expect to resolve it fairly promptly, but I do want to wait

24   and see this issue about whether these documents should be

25   sealed or not sealed.  Okay?  All right.  Thank you very

Page 60

1     much.

2          So let's move on in the agenda; just bear with me

3     a second.  All right, we're going to move on to the issue of

4     the bidding procedures motion.  Let me get -- I need to get

5     my papers in front of me with respect to that specific

6     motion.

7          MR. KOENIG:  Thank you, Your Honor, and I'm going

8     to cede the lectern to my partner, Dan Latona for that

9     matter.

10          THE COURT:  All right, just bear with me.

11          MR. PESCE:  Likewise, Your Honor, the committee

12     will be represented by Mr. Colodny, who will speak to that

13     issue.

14          THE COURT:  All right.  Okay, just give me a

15     second.  I got a lot of paper in front of me here.

16          All right.  So with respect to the bidding

17     procedures motion, I'm allocating a maximum of 40 minutes:

18     15 minutes in support divided between the Debtor and the

19     committee and reserving 5 minutes by those parties for any

20     reply, 10 minutes by the U.S. Trustee in connection with its

21     objection, 5 minutes to the State of Texas Securities Board

22     for its limited objection.

23          And then there are other -- you know, there are a

24     series of other objections, some by pro se parties, and

25     we'll see where we get to.  Again, I don't want anybody

Page 61

1    repeating arguments made by others, but let's start with the

2    arguments in support.  Again, 15 minutes in support divided

3    between the Debtor and the committee.  And I know, as I

4    understand it, the Debtor and the committee came to an

5    agreement on the terms of the proposed bidding procedures.

6              All right.  Who's going to begin for the Debtor?

7              MR. LATONA:  Good morning, Your Honor.  For the

8    record, Dan Latona of Kirkland & Ellis on behalf of the

9    Debtors.

10             Before I begin, I've been made aware that somebody

11   is livestreaming this hearing on Twitter Spaces.  The

12   username is a Donnainclusive.

13             THE COURT:  Deanna, are you able to cut them off

14   from the hearing?

15             CLERK:  I don't see that name.

16             THE COURT:  All right.  You can be held in

17   contempt for doing what you're doing.  If I get the identity

18   of the party that's livestreaming this hearing, you will be

19   subject to a contempt proceeding in this Court with very

20   serious sanctions.  You either stop streaming now.  If we

21   learn who you are, you will be held to account for it.

22             Go ahead, Mr. Latona.

23             MR. LATONA:  Thank you, Your Honor.

24             THE COURT:  Mr. Latona, let me just say if you get

25   any more information that they're continuing the livestream,

Page 62

1  please advise and our IT people will begin their

2  investigation, and as I say, the most serious consequences

3  from violating the Court restriction.  Go ahead.

4            MR. LATONA:  Thank you, Your Honor.  I have been

5  made aware that it's been discontinue or disconnected.

6            THE COURT:  All right, go ahead.

7            MR. LATONA:  Again, for the record, Dan Latona of

8  Kirkland & Ellis on behalf of the Debtors.

9            The next item on the agenda is the Debtors'

10  bidding procedures motion filed at Docket No. 929.  The

11  Debtors did file a reply to the various objections that were

12  filed at Docket No. 1109, and the Debtors did upload a

13  revised proposed order at Docket 1148 that was uploaded this

14  morning.

15            And, Your Honor, I'll be brief and allow some time

16  for the committee to argue.

17            Since the first day hearing, the Debtors have made

18  clear that the goal of these Chapter 11 cases is to maximize

19  the value of the Debtors' estates.  And very early on in the

20  cases, the Debtors took the step of beginning to market

21  certain of their assets, most notably the GK8 business.

22  That bidding process and sale process has been ongoing and

23  the Debtors have extended the dates at various times to

24  allow that process to continue.  The final bid deadline

25  there is expected to be November 2nd with a sale hearing

Page 63

1   November 15th.

2          This case, as Your Honor and everyone else is

3   aware, presents many issues of first impression and that

4   requires a unique approach to any transaction structure that

5   will allow the Debtors to continue either on a standalone

6   basis or as part of another structure.

7          Since the beginning of the Chapter 11 cases, the

8   Debtors' focus has been on stabilizing operations, but now

9   is the time to move these cases forward and that begins

10  today with the bidding procedures.

11         The Debtors are working on a business plan.  But

12  after the formation of the creditors' committee, the

13  Debtors, in consultation with that committee, decided to

14  conduct a market check on their business on a parallel track

15  to the business plan.  This will ensure that whatever

16  transaction structure these Chapter 11 cases ultimately take

17  will be a value maximizing transaction for the benefit of

18  all stakeholders.

19         The bidding procedures that the Debtors filed are

20  substantially similar to the bidding procedures approved in

21  similarly sized Chapter 11 cases.  They provide flexibility

22  with respect to transaction structure, including the ability

23  of a party to invest in equity in a reorganized debtor or

24  other entity, or the ability to select a stalking horse

25  bidder if doing so would maximize the value of the debtors'

1    estates.

2          These bidding procedures were extensively

3    discussed with the creditors' committee.  And given the

4    unique complexities and concerns in these cases, the Debtors

5    provided various consent and consult rights to the

6    creditors' committee, including the ability to review

7    qualified bids, review stalking horse bids in the

8    participation in diligence.

9          The Debtors are conducting a parallel process for

10   their retail platform assets in any remaining assets and

11   that's broken down into these categories: the retail

12   platform is the earned accounts and coin balances, retail

13   and institutional lending portfolios, swap and staking

14   services in self-page in Celsius X.  The remaining assets

15   consist of the Debtors' mining operations and any assets

16   that are not sold pursuant to the retail platform.

17         Now since the Debtors filed the bidding

18   procedures, we have received various objections and have

19   worked with the committee and certain of these parties to

20   resolve those objections.  Importantly, the revised proposed

21   order extends the timeline --

22         THE COURT:  You've moved it out until after we get

23   the examiner's at least preliminary report.

24         MR. LATONA:  That's correct, Your Honor.  Among

25   other things, the stable coin motion is set to be heard on

1   November 1st, the custody and withhold issues are set to be

2   heard on December 7th and 8th, and the examiner's report is

3   due December 10th.  The Debtors moved the final bid deadline

4   back to December 12th, so all bidders will have clarity and

5   certainty on those key legal issues before submitting their

6   bids.

7            THE COURT:  Well, you assume that I will be able

8   to resolve the custody and withhold account holders, those

9   important issues by that date.  I've set the hearing date,

10  but it doesn't assure that you're going to get -- I doubt

11  whether you'll get a ruling from the bench on that.

12            MR. LATONA:  Understood, Your Honor.  And these

13  bidding procedures do provide flexibility for the Debtors

14  and the committee to move those dates to the extent that

15  parties in interest are still lacking transparency or

16  certainty on those dates.

17            The revised proposed order also provides for

18  different structures of bids, including equity to be issued

19  in either a Reorganized Debtor or other entity, which allows

20  for a more creative transaction structure in these unique

21  cases.

22            And finally, Your Honor, the revised proposed

23  order provides more transparency for regulatory agencies.

24  We've committed to providing them with the identities of the

25  qualified bidders and allowing them to listen into the

1    auction on a listen-only basis so that they're aware of the

2    entities that are bidding and their ability to either

3    satisfy or have satisfied certain regulatory requirements.

4            THE COURT:  Could you just briefly address the

5    criteria for eligibility of bidders?

6            MR. LATONA:  Yes, Your Honor.  It's set forth in

7    Section 7, the bid requirements.  Each bid must identify and

8    fully disclose each entity and their shareholders, partners,

9    investors, or ultimate controlling entities.  So as part of

10   that bid, they'll have to identify who they are and, as part

11   of that process will be providing that information over to

12   the state regulators so that they're aware of the entity

13   that's bidding on the assets and their ability to satisfy

14   regulatory requirements.

15           THE COURT:  Okay, thank you.

16           MR. LATONA:  Your Honor, the Debtors believe that

17   those revisions to the proposed order resolves many of the

18   issues that the objecting parties have raised, and to the

19   extent they don't, the remaining objections should be

20   overruled.

21           First, with respect to the U.S. Trustee, the U.S.

22   Trustee cites certain privacy policy concerns.  The U.S.

23   Trustee correctly points to the Debtors' privacy policy that

24   allows the Debtors to sell their information pursuant to a

25   business transaction or a sale and, pursuant to Section

Page 67

1    363(b)(1), a consumer privacy ombudsman is not required.

2    However, to the extent that a purchaser does not abide or

3    adopt the Debtors' consumer privacy policy, the Debtors

4    reserve the right to seek appointment of a consumer privacy

5    ombudsman.

6         THE COURT:  I do want to address that right now.

7    I'm not ruling.  I'm probably going to take this issue, the

8    motion under submission, but I have to tell you that my very

9    strong inclination is to require the appointment of a

10   consumer privacy ombudsman.

11        From the start of this case, the issues concerning

12   particularly the individual account holders, it was

13   certainly important with respect to the sealing motion that

14   led to a lengthy opinion on my part, and I understand the

15   Debtors' position that its privacy policies are such that it

16   would not require a consumer privacy ombudsman in this case.

17        Would you agree that I have the discretion to

18   require the appointment of a consumer privacy ombudsman?

19        MR. LATONA:  Your Honor, the Debtors will abide by

20   whichever decision Your Honor submits.

21        THE COURT:  Okay.  Go ahead with your argument

22   then.

23        MR. LATONA:  Thank you, Your Honor.  With respect

24   to Section 363(o), Section 363(o) applies notwithstanding

25   Section 363(f).  So to the extent that any of the Debtors'

Page 68

1   consumer credit contracts are subject to the Truth in

2   Lending Act, Section 363(o) will preserve certain defenses.

3   To the extent that any of the contracts are amended, the

4   Debtors will notify the committee, the U.S. Trustee, and the

5   Court.

6           Your Honor, I believe certain of the states'

7   objections are resolved.  I'll, you know, certainly allow

8   them to speak for themselves.

9           With respect to the various pro se objections, to

10  the extent they were not resolved by the Debtors' revised

11  proposed order, the Debtors submit that they are entirely

12  without merit and should be overruled.

13          THE COURT:  All right.

14          MR. LATONA:  In sum, Your Honor --

15          THE COURT:  I have your arguments.  Let me hear

16  from committee counsel.

17          MR. COLODNY:  Aaron Colodny from White & Case on

18  behalf of the committee.  Can you hear me?

19          THE COURT:  Yes, I can, Mr. Colodny.  Go ahead.

20          MR. COLODNY:  Thank you.  I'm going to avoid

21  trying to duplicate what Mr. Latona said, but I want to

22  touch on three things that have changed with respect to the

23  bid procedures from how they were initially filed.  The

24  first is the timeline, which I think is where most of the

25  objections were focused.

1           As Your Honor knows, there's a delicate balance

2    between providing enough time for people to do the work, to

3    do a value maximizing transaction, for the examiner to

4    submit her report, and for the Court to make its decision,

5    and the need to get out of Chapter 11 quick.  I think that

6    everybody here understands that getting recoveries to

7    account holders as fast as possible is key and the bid

8    procedures and the conclusion of an auction is not

9    necessarily the final step.  And when we looked at this, we

10   also ran up against the holiday, which come and would incur

11   an additional month of delay, and we think that this

12   schedule strikes the right balance.

13          We understand that the Court may not be able to

14   issue its ruling on the custody dispute, but a hearing will

15   be heard.  And to the extent bidders have hesitation about

16   submitting bids, it provides the Debtors and the committee

17   with the ability to extend those deadlines if there are

18   serious concerns.

19          It provides nearly two months until bids are due,

20   which we think gives enough time for people to do the work,

21   for the Debtors to get them the required information to move

22   forward.  And it also allows for both the examiner's interim

23   report which is due on or about November 18th, and the final

24   report which is due December 10th to be issued before that

25   final bid deadline.

1           So I know that this is a delicate balance, but we

2      think this strikes the right balance of speed and value

3      maximization.

4           The second one is the consideration that may be

5      returned or may be offered.  Working with the Debtors, we've

6      broadened the consideration from just cash to cash and

7      equity, which will provide for flexibility for people to

8      come forward with the best proposal.  We think that's

9      essential to maximizing values here.

10          And then the third point is what Your Honor

11     mentioned, the requirements for a bid.  And I want to point

12     out the unique requirement that a bidder must come forward

13     with its plan to meet regulatory requirements.  I remember

14     at the first hearing we were involved in this case, the

15     Court very plainly asked the Debtors how it was going to

16     emerge with the regulations.  This requires a path to that

17     to have a successful bid that will be considered.

18          I don't want to repeat too much, Your Honor, and

19     want to be mindful of the time you set.  And so, the

20     committee's position is that it will -- it does support

21     these procedures.  It also understands the Debtors working

22     on a standalone plan and we have not seen that plan lately -

23     - or we have not seen that plan yet.  We believe that it

24     will be provided to us shortly, and we anticipate it will

25     move along a similar schedule, and we reserve all rights

Page 71

1    with respect to that.

2            THE COURT:  And do you have a position on the

3    consumer privacy ombudsman?

4            MR. COLODNY:  Your Honor, we are all in favor of

5    any measures to protect account holders' information, and to

6    the extent Your Honor believes that a consumer privacy

7    ombudsman is necessary here, we support its appointment.

8            THE COURT:  All right.  Thank you very much, Mr.

9    Colodny.  Miss Cornell.

10           MS. CORNELL:  Good morning again, Your Honor.  For

11   the record, Shara Cornell on behalf of the United States

12   Trustee.  I'll keep this short and sweet.  I think our

13   papers say the majority of what we need to say.

14           But just to reiterate, you know, this is not a

15   traditional, you know, melting ice cube situation.  There's

16   no stalking horse bidder, there's no designated breakup fee

17   yet, but they might be included later if one arises.

18           THE COURT:  May I ask you this though, Miss

19   Cornell?  Where is the cash going to come from to operate

20   the business when we get to January?

21           MS. CORNELL:  You know, Your Honor, it's a really

22   good question, and I don't know because to this date --

23           THE COURT:  I mean, because you start by saying

24   this is not the instance of a melting ice cube.  But

25   potentially, it becomes a very serious issue for the Debtor

1    to continue to fund its operations when we get -- you know,

2    I won't put a specific date in mind, but certainly when we

3    get to 2023, it becomes important.  And that's why -- so I

4    certainly understood the portion of your objection regarding

5    examiner, the examiner is working hard, has indicated, you

6    know, her intention to have an interim report; that's very

7    important.  I think it'll be very important to the potential

8    bidders, as well as to the state regulators and others and

9    your office.

10            But I am very concerned.  I think this case needs

11   to move forward as quickly as possible.  You know, we'll get

12   to the issues and discussion about the fee examiner.  There

13   are lots of professionals who are working on this whose

14   meters are running.  This is clearly an expensive case, and

15   I think -- I am concerned by your position about -- how long

16   do you want to put this off?

17            MS. CORNELL:  I understand that, Your Honor, and I

18   understand your concern about funding the case.  But to

19   date, there's been a lot of changes in the Debtors' position

20   in how they're going to fund this case.  Right now, they're

21   saying that they need to sell these assets to fund the case.

22   Previously, it was that the mining business was going to

23   support this case.

24            THE COURT:  They haven't exactly said they have to

25   sell the business.  The committee has pushed the Debtor to

Page 73

1    follow a two-track approach.  As I understand it, the

2    Debtors are still pursuing a standalone plan, but have also

3    agreed with the committee to pursue the alternate route of a

4    sale, multiple sales.

5         So I'm not sure if I'm not feeling a greater sense

6    of urgency than some of the other parties are, but I am

7    feeling a sense of urgency to move this forward.  It doesn't

8    assure that there will be a sale, but it sets in motion a

9    set of procedures, which seem to me to be fairly balanced.

10        It, frankly, looks to me that the committee of

11    unsecured creditors has had substantial input with the

12    Debtor in charting a path forward to bidding procedures that

13    would, if that's what's followed, maximize value.  I mean, I

14    think we're all in agreement that the goal is to satisfy

15    creditor claims to the fullest extent possible.

16        MS. CORNELL:  Absolutely, Your Honor.

17        THE COURT:  I think time works against that is my

18    concern, Ms. Cornell.

19        MS. CORNELL:  Your concerns are understandable,

20    Your Honor, and I understand that, but I don't want to -- we

21    can put that to the side for now.

22        But I also just want to, with respect to the

23    privacy ombudsman, I just want to reiterate that we agree

24    with Your Honor with respect to that issue.

25        And then with respect to 363(o), I understand that

1    in the Debtors' reply, they suggest that if the TLA applies,

2    you know, they will work accordingly.  I think that any

3    order needs to be much more specific as to whether or not

4    that, you know, the Truth in Lending Act applies and what

5    that means for this case.  The motion was silent as to that.

6    And it sounds to me that the retail platform sale is

7    necessarily going to include the lending portfolio.

8              THE COURT:  All right.  I would hope, Miss

9    Cornell, that if an order that gets entered includes a

10   requirement for a consumer privacy ombudsman that your

11   office proceeds very expeditiously to appoint somebody.

12             MS. CORNELL:  Absolutely.

13             THE COURT:  Okay.  Because I do think -- look,

14   it's no secret it's something I feel pretty strongly about

15   in the context of this case and other cases, but in this

16   case in particular.  And I think getting a good consumer

17   privacy ombudsman in place quickly could help the process of

18   drafting any APA or whatever the form the agreement takes,

19   okay?

20             MS. CORNELL:  Understood, Your Honor.

21             THE COURT:  All right.  Anything else you want to

22   add?

23             MS. CORNELL:  No, thank you, Your Honor.

24             THE COURT:  All right.  Let me hear from -- Miss

25   Milligan, you're going to argue on behalf of the Texas

1    Securities regulator?

2           MS. MILLIGAN:  Yes, Your Honor.  Can you hear me?

3           THE COURT:  Yes, I can.  Please go ahead.

4           MS. MILLIGAN:  Thank you, Your Honor.  Layla

5    Milligan with the Texas Attorney General's Office appearing

6    on behalf of the Texas State Securities Board and the

7    Department of Banking.  I'll keep my comments very brief.

8           Our primary concern in the limited objection that

9    was filed was the timing.  Our concern was the attempt to

10   market and sell property that has not yet been defined by

11   this Court as actually property of the estate, owned by the

12   Debtor, and would attempt to sell that and how that would be

13   successful with all of the pending open issues involving the

14   investigation by the committee and the examiner.

15          We believe that those issues are resolved with the

16   extension of the deadlines passed by this Court's --

17          THE COURT:  So you're satisfied with that

18   extension.

19          MS. MILLIGAN:  We are and we're appreciative of

20   that extension.

21          THE COURT:  Okay.

22          MS. MILLIGAN:  Comments will be brief, and I

23   appreciate this Court's time.

24          THE COURT:  All right.  Thank you very much, Miss

25   Milligan.  May I ask you this, Miss Milligan?  I think, and

1   I think really Debtors' counsel addressed this, you're going

2   to get the information on who the prospective bidders are,

3   and you'll have an -- it's obviously on a confidential

4   basis, but your office would have an opportunity to begin to

5   weigh in with the Debtors and the committee about any

6   concerns you have about particular bidders.

7           I just would urge, if this motion is approved,

8   that you and I know other states and we'll also hear from --

9   there's a limited objection from the coordinating states as

10  well -- I'm not sure whether they have anything beyond what

11  your position has been -- but that you try to confer with

12  them and to the extent that you're able to, speak with a

13  unified voice in terms of the process of any concerns that

14  the state regulators have with respect to prospective

15  bidders.

16          MS. MILLIGAN:  Absolutely, Your Honor.  I'm happy

17  to coordinate with the other state regulators, regulatory

18  bodies, and we've been in communications with the committee

19  and Debtors' counsel, and we'll continue to do that.  Our

20  goal is to make sure that whoever the potential purchaser is

21  meets all the regulatory requirements or can meet them and

22  we want to keep those lines of communications open to have

23  this be a successful transaction.

24          THE COURT:  Thank you very much, Miss Milligan.

25          MS. MILLIGAN:  Thank you, Your Honor.

1          THE COURT:  All right.  What I'd ask now if anyone

2    else wants to be heard that they use the raise hand function

3    on the bottom of your screen, and I'll try and call on your

4    in the order in which hands go up.

5          Mr. Frishberg.

6          MR. FRISHBERG:  Thank you, Your Honor.  This is

7    Daniel Frishberg, pro se.  I'll be pretty brief today,

8    basically to respond to the Debtors' response to my

9    objection.

10          One of the reasons I did not object to the bidding

11    procedures was because the U.S. Trustee and other parties

12    already did.  I noticed that the Debtors responded partially

13    to each pro se objection to say that they are without merit.

14    I disagree.  I believe that the actions they said part --

15    alleging breach of fiduciary duty met the standards of that

16    in Boone because the Debtors and the Debtors' counsel did

17    not move up the sale but for.

18          The estate would not be billed for the associated

19    costs moving it up to a rear date and then moving it back to

20    the original deadline.  They knew the full litigation

21    schedule pretty well with custody and withhold, that it

22    would not have been resolved by that point, and they knew

23    there were other claims under 541 that had yet to be filed,

24    let alone resolved in this Court, and they are asking

25    bidders to bid without knowing what is property of the

1     estate which would reduce the value of the final bids, as

2     well as the intensity and veracity of the bidding.

3              The Debtors' counsel is among some of the best in

4     the world, so they should have been able to predict that

5     there would have been objections and the issues had been

6     unresolved, which would have caused the sale to be delayed.

7     And for that reason and the additional costs, including

8     legal fees that were incurred by moving the sale, should be

9     denied.

10             Thank you, Your Honor, and that is all for now.

11             THE COURT:  Thank you, Mr. Frishberg.  Mr.

12    Herrmann.

13             MR. HERRMAN:  Thank you, Your Honor.  I'll try to

14    be brief as well.

15             While I submitted two filings and they contain

16    what you need to know on my position on bidding procedures

17    and a lot of my positions, and they also contain how a lot

18    of creditors who have been very involved in this process and

19    are either leading ad hocs or just incredibly active and

20    spending a lot of time on this case feel about the bidding

21    procedures as well.

22             First, I am relieved that these changes were made

23    to the bidding procedures, which were completely untenable

24    before and weren't going to work.  I'm glad --

25             THE COURT:  Let's deal with what's before me now

1    and not was before, okay?

2            MR. HERRMAN:  Yeah, of course.  Yeah, I'm glad

3    that the UCC can talk with bidders.  I would say we want a

4    community-centered plan with creditor groups and potentially

5    ad hocs involved.  We want creditors involved in formulating

6    the plan and talking with bidders, whether it is a bid or

7    whether it's a --

8            THE COURT:  Well, you're not going to get to talk

9    to the bidders, Mr. Herrmann.

10           MR. HERRMAN:  All right.  All right.

11           THE COURT:  That isn't going to happen.  I mean,

12   let me, in saying that, I value your input and I value the

13   input of the other pro ses who have been appearing regularly

14   at hearings and I always try to call on you and others to

15   give an opportunity to speak.

16           But in terms of the sale process, I mean, I'm not

17   -- you know, we'll see where the sale process comes out,

18   with how many bidders, et cetera.  You'd certainly have an

19   opportunity to -- if they're a stalking horse or proposed

20   parties to a transaction, you'll certainly have an

21   opportunity to object then, but not to participate in any

22   negotiation with them.

23           MR. HERRMAN:  All right.  Well, fair enough.

24   Thank you for letting me know that, Your Honor.

25           So, yeah, I guess I would say also I did file a

Page 80

1    supplemental limited objection.

2            THE COURT:  You did and it's ECF Docket No. 1080.

3            MR. HERRMAN:  Correct, yes.  And I think, you

4    know, deciding this before property of the estate issues are

5    decided, I think is a little bit premature.  I mean, we'll

6    see.  I'm reserving judgment.

7            We haven't had litigation on loan collateral or

8    returned loan collateral, return of collateral in clear

9    breach of the contract terms, including around settlements

10   with regulators that said that they would not put, you know,

11   coins into -- that they would not put them into earn after a

12   certain date.  I signed a contract stating explicitly that

13   it was my property when I signed the loan agreement.  And

14   so, then they return points --

15           THE COURT:  Let me just say, those issues are

16   clearly coming before me and they clearly have to get

17   resolved, but let's deal specifically with the bidding

18   procedures motion, okay.

19           MR. HERRMAN:  Okay.  I mean, in terms of the

20   bidding procedures, I would say I want to preview that, you

21   know, around when exclusivity ends.  I will be making some

22   requests about how we might further improve the process to

23   resolve these issues in a collaborative way.  I haven't

24   figured it out.  I think that there -- I don't think this

25   can all be resolved through litigation, Your Honor.  Like, I

1    think I've listed those issues.  I think it is material --

2            THE COURT:  Mr. Herrmann, litigation in a

3    bankruptcy case is the last resort, not the first.

4            MR. HERRMAN:  Good.  I'm glad to hear that,

5    because I think that, like, a lot -- I think that we can

6    hopefully find a way to not have this drag on forever.

7            THE COURT:  Okay.  All right, let me call on Miss

8    Cohen next.

9            MS. COHEN:  Yes, Your Honor.  This is Hollace

10   Cohen.  The first thing I'd like to note is that the Debtor

11   has mistakenly listed my client as pro se, whereas I and my

12   firm, Fisher Broyles, are representing him, so I wanted to

13   clarify that.

14           The other item that I wanted to address very

15   briefly is the fact that our client has been very concerned

16   about assets that are not property of the estate, of the

17   Debtors' estate, end up in a sale.

18           I don't think that the dates alone are what gives

19   me some comfort because that is kind of slight.  But I did

20   appreciate where they're talking about the fact that they

21   can't sell assets that are not yet determined to be property

22   of the estate if there's any kind of dispute.  They say for

23   the avoidance of doubt -- this is their reply to our

24   objection -- they say for the avoidance of doubt, the

25   Debtors will not sell or purport to sell any assets absent a

1    finding by the Court that they have title and it's all ready

2    to sell the assets.

3             Now, we would have looked for some language in the

4    order itself that recognized that and that would be our

5    preference, but I do understand that they have at least so

6    stated.

7             THE COURT:  All right.  Thank you very much, Miss

8    Cohen.  Mr. Kotliar.

9             MR. KOTLIAR:  Hi, good morning, Your Honor.  Brian

10   Kotliar of Togut, Segal & Segal, counsel for the ad hoc

11   group of custodial account holders.

12            Your Honor, we've obviously made our position

13   clear that custody assets are not property of the estate.

14   We don't have consultation rights under the bidding

15   procedures and we're not seeking any consultation rights.

16            I'd just like to address one thing that Mr.

17   Herrmann said, which is to the extent that any bidders would

18   like to speak with us regarding the custody assets or the

19   custody business, we're more than happy to speak with them

20   and we welcome those conversations.

21            THE COURT:  All right.  Thank you very much.  All

22   right, Miss Cohen, if you could put your hand -- you got to

23   lower the hand function.  I've given you an opportunity.

24   And, Mr. Kotliar, the same for you; please lower your hand

25   so I don't see them on the screen, okay?

1              Is there anybody else who wishes to be heard

2     before I give the brief time for reply?  Mr. Herrmann,

3     you've already been heard.  Your hand is still up, but I'll

4     only listen to you once with respect to this motion, okay.

5              All right, for the moving parties.

6              MR. LATONA:  Again, for the record, Dan Latona of

7     Kirkland & Ellis on behalf of Debtors.  I'll be brief, Your

8     Honor.

9              The bidding procedures are proceeding on a dual

10    track, along with a standalone reorganization.  The Debtors

11    are open to pursuing any transaction that maximizes the

12    value of the estates.  The bidding procedures do allow the

13    Debtors to select a stalking horse bid and offer bid

14    protections.  Those would be put before Your Honor, so any

15    party in interest would be able to object.

16             Responding briefly to a few of the other

17    objections.  The Debtors have their fiduciary duties

18    directly to the Debtors and the Debtors' counsel will take

19    actions that maximize the value of the estates.  The

20    decision with respect to fees of any professionals is not

21    before Your Honor today and this is not the proper forum.

22    And certain issues with respect to property of the estate

23    are yet to be decided, but they are in front of Your Honor

24    but not today.

25             So, in short, the Debtors say that the bidding

Page 84

1    procedures are a sound exercise of the business judgment and

2    should be approved.

3            THE COURT:  Let me ask a couple of questions.

4    Have prospective bidders come forward?  Do you have any NDAs

5    yet or is there a form of NDA that's being used?

6            MR. LATONA:  Centerview, the Debtors' investment

7    banker, is actively talking to bidders.  They are doing the

8    work.

9            THE COURT:  Okay.  All right.  Is there anybody

10   else who wishes to be heard with respect to the bidding

11   procedures motion?  I plan to take it under submission and

12   not rule today.  But again, I'm going to try very hard to

13   get decisions out from all of the matters that are before me

14   today pretty promptly.  Any last change?  Okay.

15           Let's go on to the cash management motion.

16           MR. LATONA:  Thank you, Your Honor.  At this time,

17   I'll turn the podium back over to my partner, Mr. Koenig.

18           THE COURT:  Mr. Koenig.

19           MR. KOENIG:  Good morning again, Your Honor.  For

20   the record, Chris Koenig of Kirkland & Ellis for the

21   Debtors.

22           Next up is the final cash management order.  We

23   filed a revised proposed order late last night at Docket No.

24   1145.  I'm pleased to report that I believe the entry of the

25   final order is fully consensual.  As explained in the reply

Page 85

1    that we filed the other day at Docket No. 1108, there was

2    one limited objection to the entry of the final order by the

3    U.S. Trustee.  We were able to resolve that objection

4    through, among other things, the stipulation on certain

5    security matters that the Debtors agreed to with the

6    committee, which is filed at Docket No. 813.

7              And just to provide a brief update on that

8    security stipulation, at the time of the filing of the

9    stipulation, there were still two items that needed to be

10   completed following the entry of the stipulation.  First,

11   the Debtors were to find a custodian who'd be willing to

12   hold the backup of the Debtors' account keys.  I'm pleased

13   to report we've reached an agreement with such a custodian

14   to handle the backup of the keys and the process is ongoing

15   to backup the keys with that custodian.

16             THE COURT:  And who is the custodian?

17             MR. KOENIG:  It's Coincover, Your Honor.

18             THE COURT:  All right, go ahead.

19             MR. KOENIG:  And additionally, the stipulation

20   provided that the Debtors and the committee would seek an

21   acceptable custodian as defined in the stipulation with

22   respect to implementing the transfers of cryptocurrency.

23   Those discussions remain ongoing between the Debtors and the

24   committee and potential acceptable custodians.  But the

25   comprehensive security protocol set forth in the stipulation

Page 86

1    reflects the agreement of the Debtors and the committee

2    regarding heightened protocols to ensure that the Debtors'

3    assets are properly protected during these Chapter 11 cases.

4           The only other item I wanted to address, Your

5    Honor, is that as we explain in our reply, there are two

6    brokerage accounts for which we believe a waiver of the

7    requirements of Section 345 of the Bankruptcy Code is

8    appropriate.  We have two brokerage accounts: first, the

9    Oppenheimer account, which has a zero balance but will

10   remain open.  The Debtors have agreed not to use it during

11   these Chapter 11 cases.

12          And then there's another account, the SSG account.

13   It's impractical to close that account at this time.  The

14   units in that account are illiquid and, as we set forth in

15   our reply and in the attached declaration, it would be very

16   difficult to sell those illiquid units at this time.  It

17   would be value destructive, Your Honor.

18          So for those reasons, we would respectfully

19   request that the Court enter the final order that we filed

20   last night.

21          THE COURT:  All right.  Miss Cornell.

22          MS. CORNELL:  Thank you, Your Honor.  Shara

23   Cornell again for the record with the Office of the United

24   States Trustee.

25          What the Debtors have said is accurate.  The

Page 87

1   Debtors have shown that the funds are secured, and we

2   understand that they're requesting a waiver from the Court.

3   At this time, we believe that they've satisfied our

4   requests.

5          THE COURT:  Yeah.  The 345 does provide the Court

6   with the ability to waive the requirements of 345.  The

7   Debtor has the burden to establish good cause for the waiver

8   of the requirements of 345.  Cases such as Celsius involving

9   crypto assets raises some very challenging issues.

10          In the very first objection that the U.S. Trustee

11   filed, the issue of whether crypto assets are current for

12   purposes of 345 is an unsettled issue.  I made clear at a

13   very early hearing that whether or not 345 specifically

14   applied.  My major concerns rested on the issue of security

15   of the assets, and I'm certainly pleased that the U.S.

16   Trustee and the Debtors have been able to reach agreement.

17          Let me also hear from the committee on this issue.

18          MR. COLODNY:  Your Honor, Aaron Colodny from White

19   & Case on behalf of the committee.  I want to note that we

20   have reached agreement with the Debtor which is in the coin

21   stipulation.  That stipulation has been presented to Your

22   Honor, but I don't believe it's been entered.

23          THE COURT:  Right.  I wanted to hear this whole

24   thing before...

25          MR. COLODNY:  Okay.  And so, what the coin

1    stipulation provides and the security that we think is

2    important is, first, the backup of the keys, which as Mr.

3    Koenig said, has been completed with Coincover.  The second

4    is the acceptable custodian, which I can report Mr. Koenig's

5    comments are correct.  We've been working constructively to

6    try to find somebody, and that process is ongoing.

7            One other thing I will highlight from the coin

8    stipulation is any transfer has to be done, first, pursuant

9    to a court order; second, authorized by four authorized

10   individuals, three of whom must be United States authorized

11   individuals; and, third, be approved by the special

12   committee.  The committee also has to receive notice of

13   those transfers.

14            And so, we think that these, coupled with the

15   backup of the keys, provides adequate protection of the

16   crypto assets and notice if they ever get moved, and we ask

17   that the Court enter the presentment.

18            THE COURT:  All right.  Does anybody else wish to

19   be heard with respect to the cash management motion, also

20   with respect to the proposed stipulation that Mr. Colodny

21   referred to.

22            All right.  I'm satisfied that the Debtor has

23   shown good cause to waive the requirements of Section 345

24   under the terms of the proposed order, which the Court has

25   reviewed, and also the proposed stipulation that Mr. Colodny

1   has referred to, so both will be entered.  I want to be sure

2   -- I don't know whether we have the Word format of the order

3   that was sent to the Court last night and of the

4   stipulation, but they will both be approved.  Okay?

5           MR. COLODNY:  Thank you, Your Honor.

6           THE COURT:  All right.  Thank you very much.  Next

7   on the agenda there is the removal extension motion, ECF No.

8   987.  It's the Debtors' motion for entry of an order

9   extending the time to file notices of removal of civil

10  actions and granting related relief.

11          Let me just ask, can somebody on behalf of the

12  Debtor, tell me how many actions there are?

13          MR. COLODNY:  Your Honor, Mr. Latona will handle

14  this matter.

15          THE COURT:  Okay, Mr. Latona.

16          MR. LATONA:  Good morning, Your Honor.  Again for

17  the record, Dan Latona of Kirkland & Ellis on behalf of the

18  Debtors.

19          At this time, I can't say for certain how many

20  actions there are.  We can certainly consult with the

21  company and report back.

22          THE COURT:  All right.  I'm going to grant the

23  application.  It's pretty standard this early in the case

24  and I'm happy to do that.  Just bear with me a second.

25          Let me just say if we get to the end of the

1  extension period and the Debtor wishes to seek a further

2  extension of it, they should file, include an exhibit to the

3  motion that lists each of the actions pending and in which

4  courts they're pending, okay.

5          MR. LATONA:  Understood, Your Honor.

6          THE COURT:  For present purposes, this first

7  extension I'm happy to grant it, so the removal extension

8  motion is granted.

9          MR. LATONA:  Thank you, Your Honor.

10         THE COURT:  Next is the examiner's motion for an

11  order authorizing the examiner to conduct 2004 examinations;

12  it's ECF No. 963.  I don't need to hear anything about it.

13  That motion is granted.  Just submit the order, and Mr.

14  Lazar and that will promptly be entered.

15         Mr. Lazar, at this stage, do you have an

16  indication of how many different parties you're going to

17  seek documents from or testimony from.

18         MR. LAZAR:  Your Honor, we do not yet, and thank

19  you, Your Honor.  We do not yet.  Most of the information

20  we're seeking at this point is coming from the Debtor, so

21  we're hoping it's going to be a relatively limited number of

22  2004 requests.  However, you know, we did want the order

23  entered given the expedited timing on an interim report.

24         And, Your Honor, just so you know, with respect to

25  the order, we did upload a revised order last night.  We

Page 91

1    didn't receive any objections, but we did receive some

2    comments from the committee, which we have incorporated into

3    that order; it's docketed at 1136.

4            THE COURT:  Thank you very much.  That will be

5    entered.  Can you just give me a very brief update, Mr.

6    Lazar, on the status of the examiner's investigation?

7    Obviously, it's a very aggressive schedule for an interim

8    report.  I'm sure you and your colleagues are quite busy on

9    that.  But without going into the details, are you able to

10   live with that schedule?  Let's put it that way.

11           MR. LAZAR:  Yes, Your Honor.  So far, we think

12   we're going to be able to live with the schedule.  We're, of

13   course, heavily focused on the interim report and the

14   information needed for that part of the report, and we are

15   making progress.

16           THE COURT:  All right, thank you.  All right, the

17   next on the agenda, and I really already dealt with this, is

18   the equity committee sealing motion in connection with the

19   motion for appointment of an official committee of the

20   preferred equity holders.

21           I've already asked for an affidavit, a declaration

22   from the Debtor with respect to the distribution of two of

23   those documents.  As to the S-1, which as I understand it,

24   was never publicly circulated, I don't have a problem about

25   that being -- I don't think I really need it for that

1    pending motion.

2            So I will take under submission without argument

3    the sealing motion and I'll wait to see the affidavit that

4    gets filed with respect to that.

5            All right, so now we get to the adversary

6    proceeding pretrial conferences.  The first, it's on the

7    agenda on Page 9, it's Item 8; it's the Celsius Network v.

8    Stone.  Who's appearing for the parties in that?

9            MR. HURLEY:  Your Honor, Mitch Hurley with Akin

10   Gump Strauss Hauer & Feld, special litigation counsel for

11   the Debtors.

12           THE COURT:  All right.  And for the defendants in

13   that case?

14           MR. ROCHE:  Kyle Roche on behalf of Jason Stone

15   and KeyFi.

16           MR. HURLEY:  Your Honor, may I make a suggestion

17   before we proceed with the Stone pretrial conference?

18           THE COURT:  Sure.

19           MR. HURLEY:  So there are two pretrial conferences

20   on: one with respect to the Stone adversary and one with

21   respect to Prime Trust.  The Prime Trust adversary pretrial

22   conference may be quite a bit shorter and simpler because we

23   have arrived at an agreement.

24           THE COURT:  All right.  Hang on and I'll call

25   that.  We'll deal with that quickly.  Just bear with me a

1    second.

2           All right, so Prime Trust is -- Celsius Network

3    Limited v. Prime Trust, LLC is Adversary Proceeding No. 22-

4    01140.  And in connection with having reviewed the docket in

5    that this morning, I have in front of me both a copy of the

6    Complaint and also the joint Rule 26(f) report.  That was

7    filed and attached to the report as Exhibit A is a proposed

8    case management and scheduling order.

9           So let me get the appearances.  I assume, Mr.

10   Hurley, you're appearing in that adversary as well.  Who's

11   appearing for the defendant.

12          MR. STEEL:  Good morning, Your Honor.  Howard

13   Steel of Goodwin & Procter on behalf of Prime Trust.

14          THE COURT:  Good morning, Mr. Steel.  All right,

15   Mr. Hurley, do you want to begin.

16          MR. HURLEY:  Thank you, Your Honor.  So we have

17   good news to report.  Last night, Celsius and Prime Trust

18   were able to agree on the terms of the stipulation that

19   will, if approved by Your Honor, pursuant to Rule 9019,

20   settle the litigation that Celsius commenced against Prime

21   Trust on August 23, 2022.  In Celsius's Complaint, we had

22   alleged claims for turnover and breach of contract with

23   respect to certain property that is currently in the

24   possession of Prime Trust.

25          Under the terms of the stipulation again, and

Page 94

1   subject to Your Honor's approval, that property would be

2   returned to a Celsius designated wallet that is to be,

3   again, approved by Your Honor.  And to the extent the

4   stipulation goes through and is blessed through the 9019

5   process, the assets are returned, that property would be

6   required to remain in that designated Celsius wallet until a

7   still further order from the Court addressing how it should

8   be distributed.

9            THE COURT:  Can you give me an estimate of the

10  value of the property that will be returned?

11           MR. HURLEY:  So prices are variable, of course, as

12  the Court is aware, but I would say it's been in the sort of

13  $16-to-$20 million range.

14           THE COURT:  All right.  Mr. Steel.

15           MR. STEEL:  Your Honor, Howard Steel, Goodwin &

16  Procter, on behalf of Prime Trust.

17           Yeah, we're very pleased we reached an agreement

18  on the stipulation, agree with Mr. Hurley's recitation.  It

19  was paramount that the procedures that we baked into this

20  stipulation provides adequate notice to each user of the

21  agreement.  And, as Mr. Hurley said, that the transfer to

22  the designated Celsius wallet is without prejudice to any

23  party in interest to asserting any interest or claim with

24  respect to the property that's going to be transferred.  L

25           So we're pleased with the result and the

1    infrastructure and look forward to moving the matter

2    forward.  Thank you, Your Honor.

3              THE COURT:  Thank you very much, Mr. Steel.  Mr.

4    Hurley, have you conferred with the U.S. Trustee and with

5    committee's counsel with respect to this adversary and with

6    respect to the proposed settlement?

7              MR. HURLEY:  We have not conferred with those

8    parties yet, Your Honor.  There will be an opportunity

9    through the 9019 process if parties have an objection to the

10   way we're proposing handling the assets.  And if those

11   objections are raised, of course, you know, we will listen

12   to people offline.  Maybe we don't even have to litigate all

13   the way to the end of a 9019 if people have objections that

14   can be addressed would, of course, be open to doing that.

15             But we wanted to be -- our real priority was

16   trying to get these assets back into the estate as promptly

17   as we can.

18             THE COURT:  I would urge you -- is the 9019

19   drafted yet?

20             MR. HURLEY:  So the stipulation requires Celsius

21   to file the 9019 motion I think by November 2nd.  And so,

22   it's not drafted yet, but it certainly can be ready to go

23   very soon, Your Honor.  We won't wait until the 2nd.

24             THE COURT:  All right.  I would urge you in

25   advance of filing the 9019 -- I'm urging you but not

Page 96

1    requiring you.  I urge you to confer with the U.S. Trustee

2    and the committee's counsel.  Yes, any party in interest

3    will have an opportunity to object to the 9019.  My focus is

4    trying to avoid any objections, and I think it's not an

5    assurance, but a way that that may well avoid objections is

6    if you confer with the committee and with the U.S. Trustee.

7             I'm not foreclosing any other parties in interest

8    from raising objections, you know, once the 9019 is filed,

9    but I would like to see if we could, in the drafting

10   process, if you could avoid any issues.  Okay?

11             MR. HURLEY:  Your Honor, we will.

12             THE COURT:  All right.  Thank you very much.  Mr.

13   Steel --

14             MR. HURLEY:  Just for the record --

15             THE COURT:  Go ahead.

16             MR. HURLEY:  -- Your Honor, before we move on.

17   Just for purposes of this conference, one of the provisions

18   in the stipulation is that all the deadlines that otherwise

19   would go forward under the adversary proceeding are stayed.

20             THE COURT:  Okay.  Hang on just a second,

21   everyone.  All right.  I apologize for that interruption.

22             Anything else with respect to the Prime Trust

23   adversary, Mr. Hurley or Mr. Steel?

24             MR. HURLEY:  Not from the Debtor, Your Honor.

25             THE COURT:  All right, so now let's get to the

1    adversary, Celsius Network Limited v. Jason Stone and KeyFi,

2    Inc.  It's Case No. 22-01139.  I've reviewed the Complaint.

3    I also have in front of me the joint Rule 26(f) report, and

4    I have the proposed case management scheduling order that's

5    prepared, which essentially is in the format of the template

6    for case management orders.

7                Mr. Hurley.  Well, first off, Mr. Roche, you're

8    appearing for the defendants in that?

9                MR. ROCHE:  Yes, both KeyFi and Jason Stone.

10               THE COURT:  Okay, all right.  Mr. Hurley, go

11    ahead.

12               MR. HURLEY:  Sure.  Your Honor, it sounds like

13    you'd like to hear a brief overview of the case?

14               THE COURT:  Yes, I would.

15               MR. HURLEY:  Okay.  So Celsius commenced this

16    action on August 23, 2022.  As amended, the Complaint

17    alleges claims for turnover, conversion.

18               THE COURT:  There was a motion to dismiss the

19    original Complaint and you filed an amended Complaint now.

20               MR. HURLEY:  Correct.

21               THE COURT:  Okay.

22               MR. HURLEY:  Complaint as amended alleges

23    turnover, conversion, fraudulent misrepresentation, breach

24    of fiduciary duty, unjust enrichment, replevin, and

25    accounting.

1          So Celsius engaged the defendants to provide

2     staking and decentralized finance services beginning in

3     August of 2020.  Celsius provided the defendants with coins

4     to deploy solely in those defined staking activities and

5     solely in approved activities.  The coins were valuable at

6     the time that they were provided.  But as a result of a very

7     sharp run up in market prices for coins, by early 2021, the

8     coins were immensely valuable, worth more than a billion

9     dollars.

10          By that time, Celsius had identified concerns

11    regarding the defendants, including related to their

12    reporting and other practices, and in early 2021, instructed

13    the defendants to return the coins.  Now, at that time,

14    Celsius is really focused on ensuring they got the coins

15    back, to make sure a proper accounting was done, and to put

16    into place additional security protocols related to the

17    coins.  And the response from the defendants was, yes, we

18    will do it, and they provided a plan to return the coins,

19    but the defendants didn't return the coins.

20          So on March 26, 2021, Celsius KeyFi, which is the

21    Celsius decentralized finance subsidiary, formally demanded

22    that Stone returned all of the coins.  The defendant's

23    response again, orally and in writing, was that they would

24    return all of Celsius's coins, plus what they claim to have

25    generated in the form of profits.  Again, this is in

1    writing.  And over a period of weeks, many of the coins were

2    returned, but a substantial balance remained outstanding.

3          As Celsius would later discover, that balance

4    apparently had been either lost or stolen by the defendants,

5    despite the fact the defendants were telling Celsius that

6    the defendants could return the coins and would return the

7    coins and could do so in 48 hours, et cetera.

8          THE COURT:  At current market prices, do you have

9    an estimate of the value of what was not returned?

10         MR. HURLEY:  Well, at current market prices, it's

11    difficult to say.  I would say it was probably, if we're

12    talking about dollar value, really rough numbers, it was,

13    you know, in the spring when the market was at its peak,

14    maybe it was $300 million worth of coins that was part of

15    the balance that was outstanding.  That number in terms of

16    U.S. dollars obviously is much smaller now because of the

17    decline in prices, but it was a substantial gap.

18         So we now know that without authorization during

19    this period of time when the defendants were representing

20    that they could and would return the coins, they actually

21    had engaged in a bunch of unauthorized activities with the

22    coins.  Again, they were only authorized to engage in

23    staking and decentralized finance, but they had begun to do

24    things like buy NFTs, hundreds and hundreds of NFTs.  They

25    acquired, it appears anyway, equity interests in certain

Page 100

1   companies, and we believe on other unauthorized forms of

2   property.  And critically, they then also stole that

3   property.

4          So you can see that they transferred, went into

5   Celsius's own wallets and transferred property in Celsius's

6   own wallets, including Celsius coins, but also including

7   things like the NFTs that the defendants purchased with

8   Celsius coins, and transferred them to wallets that on

9   information and belief are owned and controlled by the

10  defendants.

11         Now, it is true the defendants also appear to have

12  not been competent at defi, and it is possible they also

13  lost a substantial amount of Celsius coins as a result of

14  their inability to carry out the defi activities

15  successfully, but because the defendants have refused to

16  engage in an accounting, it's impossible for us to be sure.

17  We know they stole some, but it is certainly possible that

18  even more than we know was stolen.

19         Celsius did not discover the worst of the

20  defendant's misconduct for a substantial period of time and

21  Celsius remained focused on seeking the voluntary return of

22  its coins.  So, for example, the defendants request in

23  September of 2021, the parties agreed to engage in

24  confidential mediation, and we entered into a tolling and

25  standstill agreement.  That agreement was extended on

1    multiple occasions, and it didn't lapse until shortly before

2    the petition was filed in this case.

3             Just days before the bankruptcy petition was

4    filed, defendant KeyFi filed a lawsuit in New York State

5    Court.  And despite admitting that defendants failed to

6    return coins to Celsius that were, at the time as I

7    mentioned, worth probably hundreds of millions of dollars

8    and still worth tens of millions at least, you know, despite

9    the irrefutable blockchain evidence of their thefts from

10   Celsius, in that lawsuit, defendant actually claims that

11   it's Celsius that somehow owed a profit share to these

12   defendants, despite the fact that they lost enormous sums of

13   Celsius coins.

14             THE COURT:  All right.  Rather than getting down

15   into all of the weeds, what is the discovery that you wish

16   to take?  Was there any discovery, voluntary or otherwise,

17   until this point?

18             MR. HURLEY:  Some information certainly was

19   exchanged over time.  I'm not sure if characterizing it as

20   discovery is probably going a little bit too far, but there

21   were some requests for information that the defendants made

22   to Celsius, and we provided some data that the defendants

23   said would be helpful in returning coins.

24             Since the claim has been filed, the parties did

25   engage in their initial disclosures, so that initial

1    disclosure exchange on September 30th.  Celsius served

2    document requests and interrogatories on September 28th, so

3    those responses are due on 10/28, and that's where things

4    stand on discovery, Your Honor.

5              THE COURT:  Okay.  And what is your discovery plan

6    going forward?

7              MR. HURLEY:  So, the discovery plan calls for --

8              THE COURT:  Have you gotten their ESI at this

9    point?

10             MR. HURLEY:  Have we gotten their ESI?

11             THE COURT:  Yes.

12             MR. HURLEY:  Well, there hasn't been any

13   production yet in response to the requests yet, Your Honor.

14             THE COURT:  Okay.

15             MR. HURLEY:  So the responses -- but that's

16   because the responses aren't due yet.  They're not due until

17   10/28.

18             THE COURT:  Was there an exchange of information

19   in connection with the mediation?

20             MR. HURLEY:  No, there was not an exchange of

21   information in connection with mediation.

22             THE COURT:  All right.  Okay, anything else you

23   want to tell me?

24             MR. HURLEY:  A couple of modifications to the

25   ordinary schedule that Your Honor has typically in

1   adversaries, but I think they're pretty self-explanatory, so

2   happy to answer any questions you have.  And with that,

3   that's it.

4           THE COURT:  All right, Mr. Roche.

5           MR. ROCHE:  Yes, Your Honor.  I just want to --

6   don't want to get into all the facts of the case.  Mr.

7   Hurley is right.  Prior to Celsius declaring bankruptcy, we

8   did file an action seeking to -- breach of contact under,

9   there's two relevant agreements, both executed December 31,

10  2020: an asset purchase agreement from Celsius KeyFi of

11  KeyFi, and a services agreement in which KeyFi agreed to

12  provide certain defi and staking activities for Celsius.

13          This dispute, as it was initially filed by KeyFi

14  against Celsius is properly breach of contract dispute.

15  Celsius KeyFi on one hand is claiming that assets are owed

16  back to it.  Our position has been all along is that assets

17  under the accounting that was owed and was supposed to be

18  performed by Celsius, assets are -- KeyFi is owed payment

19  for the profits that it delivered back to the company.

20          Section 7.1(a), Mr. Hurley's claiming that there

21  are -- my clients didn't engage in the accounting.  But

22  under the relevant contracts at issue in this case, it was

23  Celsius that was responsible for the accounting.  Celsius

24  was aware of all the accounts that KeyFi used to manage its

25  crypto assets, and it wasn't just Celsius that was aware;

1   most of the crypto world was able to follow publicly the

2   crypto wallets that were being used to engaged in the

3   various defi and staking activities.

4           So the idea -- the framing of this case as some

5   form of theft, secret theft on behalf of KeyFi and Stone is

6   just not in accord with both the facts and what is publicly

7   known about --

8           THE COURT:  All right, let me ask you some

9   questions.

10          MR. ROCHE:  Yes.

11          THE COURT:  You had filed a motion to dismiss the

12   original Complaint.  The motion to dismiss was filed on

13   September 22nd.  On October 13th, Mr. Hurley filed an

14   Amended Complaint and there's been no response to the

15   Amended Complaint yet.  So what are you going to do in

16   response to the Amended Complaint?

17          MR. ROCHE:  We intend to file a motion to dismiss

18   most of the claims.  And I believe, Your Honor, while we're

19   not fully -- that motion to dismiss isn't fully drafted, it

20   will involve many of the same legal issues that the first

21   motion to dismiss covered.

22          THE COURT:  When will you be filing your motion to

23   dismiss?

24          MR. ROCHE:  The 20 days from the date it was

25   filed, I don't have that date in front of me, but roughly

1    within two weeks.

2            THE COURT:  All right.  Mr. Hurley, are you

3    removing the state court action to the bankruptcy court?

4            MR. HURLEY:  We didn't believe it was necessary,

5    Your Honor, but if that's something you'd like us to

6    consider, we will do that.

7            THE COURT:  Well, I haven't seen whether the claim

8    -- I just, I want all the issues resolved in one proceeding.

9    So if there are issues in the state court action that are

10   not in the federal court action, you ought to seriously

11   consider -- I don't want to find out later in this process

12   that there are other issues there in a state court

13   Complaint.

14           Obviously, I've extended the Debtors time to

15   remove actions; this is obviously one of those.  So you

16   ought to consider -- are there issues that ought to be dealt

17   with all in one sweep.

18           MR. ROCHE:  We will consider that, Your Honor.

19           THE COURT:  All right.  Let me make clear to both

20   of you, I think this should be clear from your proposed case

21   management order in any event.  I do not -- I expect

22   discovery to go forward full-bore whether or not there is a

23   motion to dismiss some or all of the claims, so motions to

24   dismiss do not have any effect on discovery before me, so I

25   expect the parties to go forward expeditiously with respect

Page 106

1    to discovery.

2            Anything else I ought to know about the actions,

3    Mr. Hurley, or what's your plan for moving forward is?

4            MR. HURLEY:  It's all in the plan, Your Honor.  I

5    mean, we will, of course --

6            THE COURT:  Okay, that's fine.  What I would ask

7    you to do is there is appropriately in Paragraph 10 a blank

8    for the next case management conference.  Typically, what I

9    want is within a week to two weeks before the end of fact

10   discovery, this be calendared for the next case management

11   conference.

12           You and Mr. Roche should confer about a date.  It

13   does not need to be a date when we're having an omnibus

14   hearing; it can be, but it doesn't need to be.  And get a

15   date from my courtroom deputy, Deanna Anderson, for the next

16   case management conference, okay?

17           MR. HURLEY:  Understood, will do.

18           THE COURT:  All right, and do that expeditiously.

19   Then revise the -- once you get that date from Deanna, just

20   submit a new case management scheduling -- call it case

21   management scheduling order No. 1.  Include that day.  I

22   think that's the only date that has to be filled -- the only

23   information that needs to be filled in in the form of the

24   order and it'll promptly be entered.  Okay?

25           MR. HURLEY:  Understood.  Thank you.

```
 1              THE COURT:  Just give me one more second.  All
 2      right, let's leave it at that.  Okay, thank you very much.
 3              MR. HURLEY:  Thank you, Your Honor.
 4              THE COURT:  I think those are the only things on
 5      the agenda.  There are some adjourned items.  We'll get to
 6      that when they come up on the hearing.
 7              I just want to reiterate.  With respect to any
 8      motions that any parties in interest wish to file, you need
 9      to (a) confer with the procedures order with respect to
10      hearings and also speak with my courtroom deputy, Deanna
11      Anderson, about getting them on the calendar.
12              All right.  Does anybody else have anything they
13      want to raise for today?  Mr. Koenig, were you raising your
14      hand?
15              MR. KOENIG:  Your Honor.
16              THE COURT:  We were going to deal with the fee
17      examiner issues.  I see Mr. Sontchi on the screen as well.
18              MR. KOENIG:  Yes.  Thank you, Your Honor.
19              THE COURT:  Okay.  Is there anything other than
20      the fee examiner issues?
21              MR. KOENIG:  No, Your Honor.
22              THE COURT:  All right.  It should be no secret
23      because I've made this point not in this case but in another
24      case.  I'm not a fan of fee examiners; that's my starting
25      point, but this may be different, so we'll start with that.
```

1           So let me turn to Miss Cornell because it's

2    usually the U.S. Trustee's Office that is the proponent for

3    a fee examiner, so let me hear from you first, Miss Cornell.

4           MS. CORNELL:  Thank you, Your Honor.  This is

5    Shara Cornell again appearing for the Office of the United

6    States Trustee.  This is a large case.  Your Honor

7    identified it earlier:  There are a lot of professionals

8    employed in this case.

9           So far, we've only seen two monthly fee

10   applications filed.  The Debtor filed one for two weeks and,

11   you know, it was roughly several million dollars and quite

12   voluminous.  A neutral party unbeholden to any of the

13   constituents -- to any constituency is in a good position to

14   make that review and, at the same time, it will benefit the

15   estate by virtue of having an independent examiner reviewing

16   those fees and saving those fees and costs for the estates.

17          And we have spoken with both the committee and the

18   Debtors, and they are both in support of that.  In light of

19   the large fees that are forthcoming, we're all in support of

20   that.

21          Thank you, Your Honor.

22          THE COURT:  Okay.  From the Debtor, Mr. Koenig,

23   are you going to address it?

24          MR. KOENIG:  Yes, Your Honor, thank you.  I'll

25   just be very brief.

1            In a different case, you know, we may have a

2     different position, but as Ms. Cornell suggested and you

3     suggested, Your Honor, these cases are unique, they're very

4     large, there are a number of professionals in the case.  We

5     think that it would speed the review process and be

6     beneficial in this particular matter given the uniqueness

7     and the complexity of these cases, so we support the

8     proposal of the United States Trustee's Office.

9            THE COURT:  All right.  Mr. Pesce.

10            MR. PESCE:  Yes, thank you.  For the committee,

11     Miss Cornell reached out to us a couple of weeks ago with

12     the idea.  We discussed it on our side.  We don't oppose the

13     appointment of a fee examiner in --

14            THE COURT:  That didn't sound overwhelmingly in

15     support.

16            MR. PESCE:  I mean, I don't think we -- I mean,

17     we're not -- we weren't proactive waving our arms for it,

18     but we don't oppose it in this case and, you know,

19     especially now that we understand the parameters under which

20     Mr. Sontchi will be operating if approved.

21            THE COURT:  Mr. Sontchi, do you want to be heard?

22     You need to unmute.  Go ahead, Chris.  Excuse me.

23     Obviously, I've known Mr. Sontchi for many -- we were in

24     baby judge's school together but go ahead.

25            MR. SONTCHI:  And you've aged better than I have,

Page 110

1   Your Honor.

2           No, I think this is -- I think that I view my role

3   here to keep an eye on costs.  That's always the role of a

4   fee examiner.  This case, I think there's so many moving

5   parts, there's so many possibilities for rabbit holes and

6   detours and repetition of effort among the various parties

7   that I think it makes a good sense to have a fee examiner.

8   Obviously, I have a vested interest in saying that, but I'm

9   willing to serve or not serve at Your Honor's pleasure.

10          THE COURT:  Are you seeking to use anyone to help

11  you in this task?

12          MR. SONTCHI:  Yes, I am, and she's online.

13  Elizabeth Stadler of Godfrey Kahn, Your Honor.

14          THE COURT:  All right.

15          MR. SONTCHI:  Katherine Stadler.  I apologize,

16  Katherine Stadler.

17          MS. STADLER:  That's okay.  Hello, Judge.

18          THE COURT:  Hello, Miss Stadler.

19          MS. STADLER:  Hi.  Well, Judge Sontchi --

20          THE COURT:  It's a monumental task.

21          MS. STADLER:  Yes, yes.  Judge Sontchi approached

22  us about taking on this engagement.  And I believe he did so

23  because of our representing a fee examiner, independent fee

24  examiner, in the Energy Future case, which was before Judge

25  Sontchi and that, likewise, was large and complicated and

1      involved a lot of fees.

2              We have experience in handling these matters.

3      Right now, I represent the fee examiner in the Puerto Rico

4      insolvency proceeding, so we have the capability of managing

5      large volumes of fee data, and we also have experience

6      identifying issues that are worth spending time looking into

7      and others that may be technical compliance issues but don't

8      really add much value to the fee examination process.

9              Obviously, if Judge Sontchi is appointed, we would

10     serve as his counsel and we would do only that which he asks

11     us to do.  And we will, if Judge Sontchi is appointed and

12     wishes to proceed with your firm's retention, we'll file the

13     usual retention papers and disclosures and that sort of

14     thing.  So we're not seeking to jump the gun on any of that,

15     but we're willing and able and have the capacity to take on

16     this task should the Court deem it appropriate.

17             THE COURT:  And how many people do you expect to

18     use in connection with the work on this?

19             MS. STADLER:  There are -- well, the list of

20     professionals right now is relatively small.  Typically, we

21     assign three or four professionals to a fee review attorney,

22     someone junior to me that works under my supervision, so I

23     would anticipate probably two to three associates.  And then

24     we have a paralegal and a data specialist who helps maintain

25     our fee review database, so I would think it would be a core

1    team of five or six people.

2          THE COURT:  Let me ask Mr. Sontchi -- I can't get

3    used to saying that.

4          MR. SONTCHI:  Yeah.  I'll remind Miss Stadler,

5    there's only one judge on the line.

6          MS. STADLER:  Sorry.

7          THE COURT:  In talking with Miss Stadler, do you

8    have any specific requests of the professionals who will be

9    submitting fee statements in terms of the breakdowns that

10   you want to see.

11         Look, here's why -- I am going to grant the

12   application.  I'm not a fan of fee examiners, and that's

13   because I sometimes think that they feel they have to earn

14   their substantial fees by whacking down the fees of other

15   professionals, justified or otherwise.

16         I am confident that you will exercise the

17   appropriate judgment, Judge Sontchi.  But I just -- what I

18   would hope is if you have -- you're the fee examiner -- if

19   you have specific formats or, you know, information that you

20   want to be included, I want all of the professionals who are

21   submitting fee applications to understand exactly what those

22   are so there isn't unnecessary back and forth.  You go

23   through the review, and you decide, well, they didn't

24   provide X to us, we want to see X.  I want to make sure that

25   you have an opportunity to prepare appropriate guidelines,

1    so people understand exactly what you want to see.

2            MR. SONTCHI:  So, Your Honor, speaking with Miss

3    Stadler and talking about this ahead of time, our first

4    order of business is actually, we're going to arrange to

5    meet with the parties that are going to be submitting fee

6    applications.  In addition, I expect -- I'd also like to

7    meet with the two ad hoc committees just to hear what their

8    concerns might be with the fees.

9            And after we have those meetings, we're going to

10   develop a memorandum that will lay out for the parties who

11   are submitting fee applications, various things that we need

12   in order to do our job and guidelines for them to think

13   about when they submit their fee applications in the first

14   place to sort of get ahead of the curve and, hopefully,

15   avoid a lot of back and forth or, god forbid, litigation in

16   connection with the fees, so we're very much focused on

17   that.

18           THE COURT:  Okay.  Is there anybody else who

19   wishes to be heard with respect to the application for

20   appointment of a fee examiner?

21           All right.  The application is granted, and I

22   think it really is important, Mr. Sontchi, that you and Miss

23   Stadler communicate with all the professionals who are

24   submitting applications so you're all on the same pages,

25   exactly what information you want to see, the format you

Page 114

1   want to see it in, and hopefully avoid a lot of back and

2   forth.  There will be, you'll have questions when you review

3   applications, there always are.

4           You know, I have many times expressed from the

5   bench, it's the least enjoyable part of my job are reviewing

6   fee applications.  Nevertheless, I've been resistant to

7   having fee examiners in cases.  It's just added a level of

8   further expense and complication.

9           So, Miss Cornell, is there a form of order that

10  you're going to submit, has it been submitted?  I haven't

11  seen it if there is.

12          MS. CORNELL:  Sure, Your Honor.  I can resubmit

13  that to you this afternoon.

14          THE COURT:  Okay, all right.  Thank you very much.

15  All right, is there anything else that we need to take up

16  today?

17          MR. KOENIG:  Not from the Debtors, Your Honor.

18  Thank you.

19          THE COURT:  From the committee?

20          MR. HERSHEY:  No, Your Honor.

21          THE COURT:  All right.

22          MS. CORNELL:  Your Honor, this is Shara Cornell.

23          THE COURT:  Go ahead, Miss Cornell.  Yeah, go

24  ahead.

25          MS. CORNELL:  I just wanted to circle back.  You

1    had mentioned earlier that you would like a statement from

2    the United States Trustee regarding the sealing motion of

3    the proposed equity committee.  I was just wondering when

4    you would like that statement filed?

5              THE COURT:  Have you seen the materials that they

6    want to file?  You know, the proposed equity committee got a

7    copy from the Debtor; the Debtor wants it seals.  Have you

8    seen the material?

9              MS. CORNELL:  I received the materials late

10   yesterday, Your Honor, yes.

11             THE COURT:  When will you be in a position?  I

12   guess put it this way.  I would like to see it by Monday at

13   noon.  I'm not expecting anything very long.  It seemed to

14   me, I think it was in F(1).  I had no problem about that

15   because I understood that that had not been circulated.

16             It was the two presentations that did give me

17   pause because, quite frankly, who got them, were they

18   subject to any confidentiality agreements, et cetera.  And

19   even if they are, that doesn't necessarily mean they get

20   sealed.  They may be subject to a confidentiality agreement

21   with private parties, but it may nevertheless include

22   information that should be part of the public record here.

23             MS. CORNELL:  Okay, thank you.  I can do that,

24   Your Honor, Monday at noon.

25             THE COURT:  Thank you very much.

1          MS. CORNELL:  Thank you.

2          THE COURT:  Okay.  Mr. Herrmann, I see your hand

3     raised.

4          MR. HERRMAN:  Yes.  I mean, I can submit something

5     by noon Monday too.  I just wanted to say that I objected to

6     the very, very short timeline and also, you know, I may want

7     to attempt to gain access to these documents.  And

8     generally, I opposed -- you know, I'd like to see more

9     reasons about why redaction is appropriate on such a short

10    timeline and just redaction in general.

11         I think in general, we should have things be

12    public, you know, in the public record and, you know,

13    creditors need to see these documents.  You know, whether

14    this committee is granted is kind of existential.

15         THE COURT:  I'm saying this only half -- well, I'm

16    saying it seriously.  I mean, I have very strong views about

17    public access to all court records, anything used by the

18    court.  Again, I said this earlier, I'm not sure I'm going

19    to rely on any of that in reaching my decision.

20         I think a lot of account holders weren't very

21    happy with my opinion with respect to sealing.  So, you

22    know, they can't all have it both ways:  If they want their

23    information sealed, but if somebody else wants to seal

24    something, they don't want it sealed.  I do have -- I've

25    written a lot of opinions.  I have strong opinions about

1     what should be sealed, what shouldn't be sealed.

2          Miss Cornell, did you want to be heard again?  I

3     see your hand up.

4          MS. CORNELL:  Yes, Your Honor.  I have one further

5     point with respect to the privacy ombudsman appointment.

6          THE COURT:  Yes.

7          MS. CORNELL:  Should we plan on appointing a

8     privacy ombudsman in the immediate future or will there be a

9     forthcoming order from Your Honor?

10         THE COURT:  Let me put it this way.  I think there

11    will be a forthcoming opinion hopefully by early next week

12    with respect to the bidding procedures motion.  If it's

13    granted, you ought to expect it's going to include a

14    provision requiring the appointment of a consumer privacy

15    ombudsman, but I haven't ruled yet.

16         I made it pretty clear that, particularly in the

17    circumstances of this case, I do think it would be -- if

18    there are bidding procedures, if anyone's buying these

19    assets, whatever the Debtors' existing privacy policy is, I

20    would want a consumer privacy ombudsman to be part of that

21    process and reviewing it.

22         So if I grant it, if I grant the motion to approve

23    the bidding procedures, you can expect it's going to include

24    a requirement for a consumer privacy ombudsman.

25         MS. CORNELL:  Got it.  Thank you, Your Honor.

Page 118

1                THE COURT:  Okay.  Anybody else wish to be heard?

2      All right, we are adjourned.  Thank you very much,

3      everybody.

4                (Whereupon these proceedings were concluded at

5      11:48 A.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       I N D E X

 2

 3                         RULINGS

 4                                          Page        Line

 5

 6   Removal Extension Motion, GRANTED       89          4

 7   Application for appointment of a fee

 8

 9   Examiner, GRANTED                       112         11

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 120

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 25, 2022